MAYO S. SISLER, PLAINTIFF-RESPONDENT AND CROSS-APPELLANT, AND APT-TO-ACRES, INC., A NEW JERSEY CORPORATION, PLAINTIFF-CROSS-APPELLANT, v. GANNETT CO., INC., A DELAWARE CORPORATION, DEFENDANT-APPELLANT AND CROSS-RESPONDENT.

Argued January 23, 1986—Decided October 21, 1986.

*John B. McCrory*, a member of the New York bar, argued the cause for appellants and cross-respondents (*Strauss & Hall*, attorneys; *John B. McCrory*, and *Robert C. Bernius*, a member of the New York bar, of counsel; *Richard A. Ragsdale*, on the brief).

*Richard H. Thiele* argued the cause for respondent and cross-appellants (*Thiele & Hermes,* attorneys).

*Thomas J. Cafferty* argued the cause for *amicus curiae,* New Jersey Press Association (*McGimpsey & Cafferty,* attorneys).

The opinion of the Court was delivered by

HANDLER, J.

This libel suit calls upon us to consider what standard of liability should be established under New Jersey law with respect to tortious defamation committed by media defendants against a plaintiff who is not a "public figure" under the First Amendment. Both courts below held that ordinary negligence was the proper standard for determining whether such defamation was actionable. They were of the view that the plaintiff was essentially a "private person" who should not be required to bear the substantial, "actual malice" burden in order to prove defamation, as might otherwise be required under constitutional free-speech principles in situations where the defamed person can be considered a "public official" or "public figure." Defendants now renew their contention as to the appropriate standard for imposing liability, stressing that plaintiff involved himself in a matter of public concern and is not entitled to the diminished burden of proving defamation accorded truly private persons; in addition they claim error in two other trial court rulings. Plaintiff likewise brings before the Court several alleged trial errors regarding the amount of his damages.

## I.

The facts in this case, as in most libel-defamation actions, are critical. In the early 1960's, plaintiff, Mayo Sisler, and several other Franklin businessmen co-founded the Franklin State Bank (FSB or bank). From the time of FSB's inception until 1980, plaintiff served as President or Chairman of the Board of the

bank. During this period plaintiff also became involved in several substantial real estate and racehorse breeding projects. In 1980 Sisler retired from all official bank positions in order to pursue his other business interests, including the operation of a wholly-owned corporation, Apt-to-Acres, engaged in breeding standardbred and thoroughbred horses.

In August of 1981, The Courier-News, a newspaper with a circulation of 58,800 in central New Jersey, published a three article series concerning alleged improper loans made by the Franklin State Bank. The initial article, not at issue in this case, appeared on August 15, 1981, and reported that State and Federal authorities were investigating FSB for questionable loans issued on falsified credit reports. In the second article, which ran on August 19, 1981, defendant, Sam Meddis, a Courier-News staff writer, reported that a company with which plaintiff was associated had sold and leased land to the landlord of an auto company under investigation for falsifying credit reports in loan applications to FSB. While the facts related by this article were true, plaintiff objected to implications that arose from the newspaper's use of the word "ties" in the headline "Bank officials have ties with firm in loan probe," and to the newspaper's characterization of plaintiff's dealings with the auto company and its landlord as "private." The third article in the series, published on August 20, 1981, and again written by Meddis, accused plaintiff of receiving undercollateralized loans from Franklin State Bank to finance his horse farm, Apt-to-Acres. In fact, plaintiff had adequately secured his loans; Meddis had misinterpreted several public deeds and records. The Courier-News published retractions to the August 19th and August 20th articles on August 28, 1981 and September 18, 1981.

Fatefully, at the time the *Courier-News* published these articles plaintiff was negotiating with Louis Guida, a leading horse syndicator, to have three standardbred horses stand stud at Apt-to-Acres for the 1982 or 1983 breeding seasons. Two of the three horses, Seahawk Hanover and Computer, were de-

scribed by a trial expert as among the top three stallions of the 1982 breeding season, while the third, Niatross, had lowered the world record for the pacing mile and was described by a trial expert as the "Horse of the Century." In the midst of these negotiations someone anonymously mailed the three Courier-News articles to Guida. Guida thereafter informed plaintiff in a letter that although he did not personally credit the articles, he could not take a chance on their veracity and was thus terminating negotiations for standing the three horses at Apt-to-Acres.

Plaintiff, together with Apt-to-Acres, filed suit for defamation in Superior Court, against Sam Meddis, The Courier-News Co., and Gannett Company, Inc., the parent of the Courier-News, as defendants. Plaintiff requested general damages for loss of reputation and mental anguish, special damages arising out of the lost stud fees from the horses, and punitive damages. At trial, the court dismissed Apt-to-Acres as corporate plaintiff and Gannett Company as a defendant. The trial judge also determined that plaintiff was not a "public figure" in terms of applying the strict "actual malice" burden of proof first described in *New York Times v. Sullivan*, 376 *U.S.* 254, 84 *S.Ct.* 710, 11 *L.Ed.*2d 686 (1964); accordingly it instructed the jury to return a verdict for the plaintiff if it found the defendant had been negligent in publishing a defamatory article. Additionally, the trial court denied plaintiff's request to submit the issues of punitive damages and damages for mental anguish to the jury. The jury returned a verdict for the plaintiff of $1,050,000, $200,000 in general damages and $850,000 in special damages.

Defendants appealed the ruling that Sisler was a "private figure," the trial court's use of a negligence standard, the adequacy of the evidence of negligence and of injury to reputation, as well as plaintiff's "standing" to recover special damages sustained by Apt-to-Acres, his wholly owned corporation. Plaintiff cross-appealed several rulings of the trial court concerning the quantum of damages. The Appellate Division

affirmed the trial court in all respects. 199 *N.J.Super.* 307 (1985). In affirming the use of the negligence standard, the Appellate Division reasoned that *Lawrence v. Bauer,* 89 *N.J.* 451, *cert.* denied, 459 *U.S.* 999, 103 *S.Ct.* 358, 74 *L.Ed.*2d 395 (1982), in which the Court found plaintiff to be a "public figure" under the First Amendment and thus subject to the "actual malice" burden, implied a lesser standard for non-public figures. The Appellate Division did not address most of plaintiff's cross-appeal on the merits, deeming the cross-appeal to be waived by plaintiff's request that the appellate court consider its cross-appeal only if a subsequent trial on the damages issue would not prejudice the initial jury award. 199 *N.J.Super.* at 329.

We granted defendants' petition for certification and plaintiff's cross-petition. 101 *N.J.* 289 (1985).

## II.

This case presents another episode in the unhappy cohabitation of the tort of defamation, which is protective of an individual's reputation, with constitutional guarantees that serve to protect free speech and press. The tort of defamation and the constitutional and common-law ideals of free speech have long competed for control over the standards of liability for false defamatory speech.

For most of American history, state common law refereed this contest free of federal intervention. Generally, the states favored allowing defamation actions to go forward at the expense of the values embodied in constitutional free speech. The defamed citizen had only to prove a false publication that would subject him to hatred, contempt, or ridicule, and general damage to reputation would be presumed. With the exception of a few isolated absolute and qualified privileges for speech considered particularly worth protecting, most false publications resulted in defamation verdicts for plaintiffs. Any potential First Amendment or similar constitutional complications

were discarded under the rationale that defamatory speech had no "value to society" and thus did not merit constitutional protection. *See Gertz v. Robert Welch, Inc.*, 418 *U.S.* 323, 369, 94 *S.Ct.* 2997, 3022, 41 *L.Ed.*2d 789, 822 (1974) (White, J., dissenting); Eaton, "The American Law of Defamation Through *Gertz v. Robert Welch, Inc.* and Beyond: An Analytical Primer," 61 *Va.L.Rev.* 1349, 1350–64 (1975).

In *New York Times v. Sullivan, supra*, 376 *U.S.* 254, 84 *S.Ct.* 710, 11 *L.Ed.*2d 686, the Supreme Court realigned the balance between the First Amendment and tortious defamation. Against the background of a "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open," *id.* at 270, 84 *S.Ct.* at 721, 11 *L.Ed.*2d at 701, the Court declared that the First Amendment "prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *Id.* at 279, 280, 84 *S.Ct.* at 726, 11 *L.Ed.*2d at 706. The holding stemmed from the Court's belief that the press, acting under the spectre of libel law, often engaged in self-censorship, editing out many true, constitutionally-protected statements because of the difficulties of proving the truth of statements in court and the expense of doing so. *Id.* at 271–72, 84 *S.Ct.* at 721, 11 *L.Ed.*2d at 701.

Subsequent cases in the 1960's extended *New York Times* to speech concerning "public figures," *Curtis Publishing Co. v. Butts*, 388 *U.S.* 130, 87 *S.Ct.* 1975, 18 *L.Ed.*2d 1094 (1967), and to invasion of privacy suits involving "false reports of matters of public interest." *Time, Inc. v. Hill*, 385 *U.S.* 374, 87 *S.Ct.* 534, 17 *L.Ed.*2d 456 (1967). These cases emphasized the importance of the dissemination of information on matters of public interest. *See Time, Inc. v. Hill, supra*, 385 *U.S.* at 388, 87 *S.Ct.* at 542, 17 *L.Ed.*2d at 467 (quoting *Thornhill v. Alabama*, 310 *U.S.* 88, 102, 60 *S.Ct.* 736, 744, 84 *L.Ed.* 1093, 1102 (1940)) ("Freedom of discussion, if it would fulfill its historic function

in this nation, must embrace all issues about which information is needed or appropriate to enable the members of society to cope with the exigencies of their period.") Their holdings stemmed in part from the idea that speech relating to public officials and figures often coincides with matters that would be of legitimate public interest. *See Garrison v. Louisiana*, 379 *U.S.* 64, 77, 85 *S.Ct.* 209, 217, 13 *L.Ed.*2d 125, 134 (1964) (public-official rule protects the paramount public interest in a free flow of information to the people concerning public officials); *Curtis Publishing Co. v. Butts, supra*, 388 *U.S.* at 154, 87 *S.Ct.* at 1991, 18 *L.Ed.*2d at 1094 (public interest in circulation of materials on public figures involved in that case "not less than that involved in New York Times"). The singular importance ascribed to speech involving a public concern reached fruition in 1971 when a three-member plurality declared that the "actual malice" requirement applied to "all discussion and communication involving matters of public or general concern, without regard to whether the persons involved are famous or anonymous." *Rosenbloom v. Metromedia, Inc.*, 403 *U.S.* 29, 44, 91 *S.Ct.* 1811, 1820, 29 *L.Ed.*2d 296, 312 (1971).

However, three years later in *Gertz v. Robert Welch, Inc., supra*, 418 *U.S.* 323, 94 *S.Ct.* 2997, 41 *L.Ed.*2d 789, the Court retreated from the *Rosenbloom* position, and limited the application of the *New York Times* standard to "public figures" and "public officials." According to the Court, these persons, who have "thrust themselves to the forefront of particular public controversies" and "usually enjoy significantly greater access to the channels of effective communication," could more justly be burdened with the actual malice standard. *Id.* at 344–45, 94 *S.Ct.* at 3009, 41 *L.Ed.*2d at 808. With the *Gertz* decision, the classification of an individual as a public or private figure became the critical determination in defamation actions.

Recent decisions of the Supreme Court have reasserted the relevance of the nature of the speech, stressing that "not all speech is of equal First Amendment importance. It is speech

on 'matters of public concern' that is 'at the heart of the First Amendment's protection.'" *Dun and Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 *U.S.* 749, 758–59, 105 *S.Ct.* 2939, 2945, 86 *L.Ed.*2d 593, 602 (1985) (citations omitted). "[I]n contrast, speech on matters of purely private concern is of less First Amendment concern." *Id.* at 759, 105 *S.Ct.* at 2946, 86 *L.Ed.*2d at 603; *see also Philadelphia Newspapers, Inc. v. Hepps*, 475 *U.S.* ——, 106 *S.Ct.* 1558, 89 *L.Ed.*2d 783 (1986) (holding that the First Amendment requires a private figure libel plaintiff to bear the burden of proving that a matter of public concern has been the subject of a false statement).

From these decisions, which attempt to pacify the warring interests of free speech and individual reputation, two themes can be discerned. The first is directed toward evaluating the strength of an individual's reputational interest. This involves an appreciation of the status or role of the aggrieved individual in relation to the subject matter of the speech. Underlying this focus is the idea that individuals who have knowingly and voluntarily exposed themselves to public commentary can more fairly be required to shoulder a heavier burden of proof in order to establish actionable defamation. The fairness of imposing a heavier burden is most evident as to a person who is a "public official," because his "position must be one which would invite public scrutiny and discussion of the person holding it...." *Rosenblatt v. Baer*, 383 *U.S.* 75, 86–87 n. 13, 86 *S.Ct.* 669, 676 n. 13, 15 *L.Ed.*2d 597, 606 n. 13 (1966). The same notions of fairness justify similar treatment of one who is a "public figure." As explained in *Gertz*, "a compelling normative consideration underlying the distinction between public and private defamation plaintiffs" is that public figures, like public officials, have either "assumed roles of especial prominence in the affairs of society" or "thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues," and thus "invite[d] attention and comment." *Gertz v. Robert Welch, Inc., supra*, 418 *U.S.* at 344–45, 94 *S.Ct.* at 3009, 41 *L.Ed.*2d at 808. For those reasons, "[t]he communi-

cations media are entitled to act on the assumption that public officials and public figures have voluntarily exposed themselves to increased risk of injury from defamatory falsehood concerning them." *Id.* at 345, 94 *S.Ct.* at 3010, 41 *L.Ed.*2d at 808. In contrast, private individuals, having "not accepted public office or assumed an 'influential role in ordering society,' " cannot be presumed to have relinquished part of their interest in the protection of their own good name and are deemed "more deserving of recovery." *Ibid.* (citation omitted). They may accordingly be allowed to establish actionable defamation under a less onerous burden of proof. Thus, in defamation actions, considerations of fairness to the individual permit the imposition of a strict burden of proof on public persons and, conversely, counsel a lighter burden to be placed on those who have remained out of the public domain.

The second decisional theme focuses on the subject matter of the speech itself. If the speech relates to a matter of public concern, it implicates the "profound national commitment to the principle that debate on *public issues* should be uninhibited, robust, and wide-open," *New York Times v. Sullivan, supra,* 376 *U.S.* at 270, 84 *S.Ct.* at 721, 11 *L.Ed.*2d at 701 (emphasis added), and "occupies the 'highest rung of the hierarchy of First Amendment values.' " *Dun and Bradstreet, Inc. v. Greenmoss Builders, Inc., supra,* 472 *U.S.* at 759, 105 *S.Ct.* at 2946, 86 *L.Ed.*2d at 603 (quoting *Connick v. Myers,* 461 *U.S.* 138, 145, 103 *S.Ct.* 1684, 1689, 75 *L.Ed.*2d 708 (1983)). Such speech requires maximum protection. Speech that does not pertain to matters of public concern rests more lightly on the free speech/reputation interest scale.

The interaction of these two themes under the First Amendment yields four possible combinations, which are by no means static or immutable. Three of these combinations were identified in *Philadelphia Newspapers v. Hepps, supra,* 475 *U.S.* ——, 106 *S.Ct.* 1558, 89 *L.Ed.*2d 783. There, the Supreme Court, in holding that the First Amendment requires a private figure to prove that defamatory speech is false when he seeks

damages against a media defendant for speech of public concern, summarized the federal accommodation of First Amendment and individual reputational interests.

> When the speech is of public concern and the plaintiff is a public official or public figure, the Constitution clearly requires the plaintiff to surmount a much higher barrier before recovering damages from a media defendant than is raised by the common law. When the speech is of public concern but the plaintiff is a private figure, as in *Gertz*, the Constitution still supplants the standards of the common law, but the constitutional requirements are, in at least some of their range, less forbidding than when the plaintiff is a public figure and the speech is of public concern. When the speech is exclusively private concern and the plaintiff is a private figure, as in *Dun & Bradstreet*, the constitutional requirements do not necessarily force any change in at least some of the features of the common-law landscape. [*Id.* at ——, 106 *S.Ct.* at 1563, 89 *L.Ed.*2d at 792.]

In a fourth case, the speech concerns the private affairs of a "public person" and the constitutional requirements are relaxed, as with all speech on matters of private concern. *See Dun v. Bradstreet, Inc. v. Greenmoss Builders, Inc., supra,* 472 *U.S.* at 759, 105 *S.Ct.* at 2946, 86 *L.Ed.*2d at 603 (speech on private matters is of less First Amendment concern); *Restatement 2nd on Torts* § 580A (actual malice standards protects communication "concerning a public official or public figure *in regard to his conduct, fitness or role in that capacity ...*" (emphasis added)).

These four combinations and their many permutations reflect changing relationships between the policies of encouraging free speech and fairness to the individual. These concerns for fairness to the individual and the importance of the subject-matter of speech necessarily underlie and inform our resolution of this case, both under the Federal Constitution and New Jersey law.

## III.

Reflecting these concerns, the constraints and limitations imposed by the First Amendment focus primarily on whether the defamatory speech relates to a topic of legitimate public concern and whether plaintiff is a public figure. We turn first

to whether the articles published in the Courier-News relate to a topic of legitimate public interest. These articles concerned plaintiff's financial dealings with a company being investigated for questionable loans, and related that plaintiff had obtained under-collateralized loans from FSB. Although the trial court determined that "no public controversy" existed before the publication of the articles, it is not clear whether the court concluded that the subject-matter of these articles was not one of legitimate interest to the public.

■ Concededly "not everything that is newsworthy is a matter of legitimate public concern, and sorting such matters from those of a more private nature may be difficult." *Dairy Stores, Inc. v. Sentinel Publishing Co.*, 104 *N.J.* 125, 144 (1986). Nevertheless, in view of the historic public and governmental concern with the role and operation of banks, particularly their financial stability, we are satisfied that the propriety of substantial loans issued by an area bank to its former-president and founder is a topic of legitimate public interest. "The business of banking ... intimately affects the commercial welfare and business interests of the people...." *First Nat'l Bank of Whippany v. Trust Co. of Morris County,* 76 *N.J.Super.* 1, 9 (App.Div.1962). Manifesting their importance, banks are subject to both the extensive Federal and State regulation. *See* 12 *C.F.R.* § 1–3805; *N.J.S.A.* 17:9A–1 to –369. Statutes also provide for regular independent examination and supervision of banks. *See N.J.S.A.* 17:9A–252 to –265. Moreover, special prescriptions have been enacted for loans by a bank to its director or executive officer. *See N.J.S.A.* 17:9A–72. The policies that actuated the particularized guidelines for incestuous loans between a bank and its high-ranking officers ensure the financial integrity of, and public confidence in, the banking system.

These policies influence our assessment of the transactions between FSB and plaintiff. Clearly the public dangers that are inherent in insider-dealing with a bank are not totally reduced

or substantially lessened when a bank deals with a former insider. Accompanying and motivating this governmental concern is the public's interest in the conduct of the banking industry. This interest encompasses, but may go beyond, the regulatory concerns of government itself. Private actors at all levels, including shareholders, financial analysts, depositors, and potential customers, have a legitimate interest in a bank's dealings. The press thus has an important function not only in reporting government activity respecting banking but also in informing the public about bank conduct. These considerations lead us to conclude that the articles published by the Courier-News, treating the adequacy of security for substantial loans made by FSB to plaintiff, its former director, relate to a matter of legitimate public interest.

The subject of the defamatory articles, being a topic of legitimate public interest, militates strongly in favor of imposing a high or strict burden of proof upon plaintiff. Nevertheless, we must determine whether it is fair to impose that burden in view of plaintiff's role or status. Under the First Amendment, this fairness determination is embodied in the public/private person classification.

The trial court, finding that plaintiff had not assumed an active role with respect to any public controversy or attempted to influence public opinion on the matter, ruled that plaintiff was not a public figure. The record supports this determination. Plaintiff has not attained "especial prominence in the affairs of society," the trademark of all-purpose public figures; nor, as is characteristic of limited-purpose public figures, has plaintiff "thrust [himself] to the forefront of particular public controversies in order to influence the resolution of the issues involved." See Gertz v. Robert Welch, Inc., supra, 418 U.S. at 345, 94 S.Ct. at 3009, 41 L.Ed.2d at 808; see also Lawrence v. Bauer Publishing and Printing, supra, 89 N.J. 451 (plaintiff who founded organization opposed to construction of new firehouse, spoke out on the issue at public meetings, and initiated

petition drive was limited-purpose public figure on firehouse controversy). Plaintiff does not command "a substantial amount of independent public interest," *see Curtis Publishing Co. v. Butts, supra,* 388 *U.S.* at 154, 87 *S.Ct.* at 1991, 18 *L.Ed.* 2d at 1111, nor does the record disclose that he achieved "pervasive fame or notoriety," *see Gertz v. Robert Welch, Inc., supra,* 418 *U.S.* at 351, 94 *S.Ct.* at 3013, 41 *L.Ed.*2d at 812, even in the Franklin Township area. Moreover, it does not appear that plaintiff has consciously sought attention on this public controversy. Particularly since his retirement, plaintiff has avoided publicity, concentrating on his private business affairs. *See Wolston v. Readers Digest Ass'n, Inc.,* 443 *U.S.* 157, 168, 99 *S.Ct.* 2701, 2707, 61 *L.Ed.*2d 450, 460 (1979) (plaintiff, who failed to respond to a grand jury subpoena, not a public figure because action was "[not] calculated to draw attention to himself in order to invite public comment or influence the public with respect to any issue"); *Hutchinson v. Proxmire,* 443 *U.S.* 111, 135, 99 *S.Ct.* 2675, 2688, 61 *L.Ed.*2d 411, 431 (1979) (recipient of Golden Fleece award, who "did not thrust himself or his views into public controversy to influence others," not a public figure).

It thus seems clear that even though the Courier-News articles relate to a subject of public concern, plaintiff would not be considered a public person under conventional federal constitutional analysis. We believe that under the circumstances of this case in light of current decisional interpretations, the First Amendment would not require plaintiff to prove that these articles were published with actual malice in order to demonstrate actionable defamation.

## IV.

■ As noted earlier, federal constitutional standards in this area are not totally preemptive. The decisions instruct us that as long as a burden of proof less onerous or exacting than actual malice is not applied in a situation that entails the

reputation of a public figure with respect to a public matter, states may apply standards of defamation liability drawn from their own laws "so long as they do not impose liability without fault." *Gertz v. Robert Welch, Inc., supra,* 418 *U.S.* at 347, 94 *S.Ct.* at 3010, 41 *L.Ed.*2d at 809.[1] We are consequently remitted to New Jersey law to determine the standard of liability to be borne by plaintiff.

Our constitution and common law have traditionally offered scrupulous protection for speech on matters of public concern. "The entire thrust of Art. I, § 6 is protection of speech."[2] *Maressa v. New Jersey Monthly,* 89 *N.J.* 176, 192, *cert.* denied, 459 *U.S.* 907, 103 *S.Ct.* 211, 74 *L.Ed.*2d 169 (1982). This provision, more sweeping in scope than the language of the First Amendment, has supported broader free speech rights than its federal counterpart. *E.g., State v. Schmid,* 84 *N.J.* 535 (1980), app. dism. *sub nom. Princeton Univ. v. Schmid,* 455 *U.S.* 100, 102 *S.Ct.* 867, 70 *L.Ed.*2d 855 (1982) (right of free speech on private university campus). Legislative enactments echo the Constitution, evincing a paramount concern for freedom of speech and press. *N.J.S.A.* 2A:84A–21 (Shield Law); *Maressa v. New Jersey Monthly, supra,* 89 *N.J.* 176. Thus, our decisions, pronounced in the benevolent light of New Jersey's constitutional commitment to free speech, have stressed the

---

[1]This limitation applies when the defamatory statement "makes substantial danger to reputation apparent." *Gertz v. Robert Welch, Inc., supra,* 418 *U.S.* at 348, 94 *S.Ct.* at 3011, 41 *L.Ed.*2d at 810. The statements in the Courier-News unquestionably fall within that characterization.

[2]Article I, ¶ 6 of the New Jersey Constitution provides:

Every person may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that right. No law shall be passed to restrain or abridge the liberty of speech or of the press. In all prosecutions or indictments for libel, the truth may be given in evidence to the jury; and if it shall appear to the jury that the matter charged as libelous is true, and was published with good motives and for justifiable ends, the party shall be acquitted; and the jury shall have the right to determine the law and the fact.

vigor with which New Jersey fosters and nurtures speech on matters of public concern.

Nevertheless, our precedents have not totally subjugated the individual's interest in the name of free speech. For instance, the fair comment privilege, which at common law protected opinions on topics of public concern, also took into account individual fairness. Implicit in the determination of what was a matter of legitimate public concern for purposes of accrual of the fair comment privilege was a fairness assessment based on the voluntariness or expectation of exposure and publicity. New Jersey courts thus accorded fair comment protection to speech regarding individuals who had assumed the risks of publicity. *See Kotlikoff v. The Community News*, 89 *N.J.* 62 (1982) (public officials); *Leers v. Green, supra*, 24 *N.J.* 239, 259 (same); *Mick v. American Dental Ass'n.*, 49 *N.J.Super.* 262, 280 (App.Div.1958) (dentist engaged in "campaign" against fluoridation); *Hermann v. Newark Morning Ledger Co.*, 48 *N.J.Super.* 420 (App.Div.1958) (labor leader); *see also* Note, "Fact and Opinion After *Gertz v. Robert Welch, Inc.:* The Evolution of a Privilege," 34 *Rutgers L.Rev.* 81, 124 (1981) ("Fair comment was regarded as particularly appropriate for those issues and personalities offering themselves to public inspection and criticism ... "); Note, "Fair Comment," 62 *Harv.L.Rev.* 1207, 1208–09 (1949) ("subjects of public interest * * * include * * * anything else inviting public attention * * * ").[3]

---

[3]Other decisions involving privileges, while favoring the speech interest heavily, have also recognized and accounted for the reputational interests of the victimized individual. For instance, a newspaper report of an official proceeding, protected by a "qualified privilege," must be "fair and accurate" and made without malice. *See Coleman v. Newark Morning Ledger Co.*, 29 *N.J.* 357, 376–79 (1959). Analogously, to accrue a qualified privilege, reports of judicial proceedings or official statements by prosecutors must relate statements made in the course of a judicial proceeding or a prosecution. *See Rogers v. Courier Post Co.*, 2 *N.J.* 393, 403 (1949). Courts have viewed the qualified privilege as accommodating the "competing social and political interests [of] the protection of the reputation of individuals, on the one hand, and

In our most recent implementation of the fair comment privilege, the Court, in *Dairy Stores, Inc. v. Sentinel Publishing Co., supra,* 104 *N.J.* 125, underscored the importance of speech concerning products that affect the public health and welfare. It held as a matter of common law that statements of *fact* regarding products that affect the public interest, in that case, the purity of commercially-sold bottled spring water, merit protection as fair comment under the actual-malice standard. The analysis exemplified in *Dairy Stores* is instructive. The Court rejected the "public figure" device as "an awkward method of determining whether statements about corporations or their products are protected by the first amendment," *id.* at 128, recognizing that all sellers of products can expect, and must accept, public examination of their products. Commercial vendors have submitted their products for inspection, and presumably invite public attention, with the accompanying risk of occasional disparaging or defamatory commentary. When disparaging or defamatory remarks are made about that product, the diminished considerations of fairness pale in comparison to the public's right to know about products of legitimate public interest. Thus, it is not unfair to burden a corporation with the actual malice standard when statements regarding its commercial activities or products implicating a matter of legitimate public concern are published.

In a defamation case involving individual reputation, the fairness assessment proceeds along similar analytical lines but against a different backdrop. Although this case, like *Dairy Stores,* involves libelous statements on a matter of public concern, it differs from *Dairy Stores* in that the plaintiff is an individual with a personal reputational interest, engaging in an essentially private transaction, rather than a corporate commer-

---

on the other the collective security and the 'interest of the public in the fullest freedom of officials to make disclosure on matters within the scope of their public duties....'" *Coleman v. Newark Morning Ledger Co., supra,* 29 *N.J.* at 376 (citation omitted).

cial enterprise selling a product to the public through regular marketing and advertising channels. The commercial seller of a product to the consuming public can be presumed to have assumed the risk of the possibility of public attention relating to the product. However, such a presumption is not appropriate in the case of a private individual engaged in private personal matters. For that reason whether it is fair to subject such an individual to a strict burden of proof in order to establish actionable defamation must be determined on a case-by-case basis.

In making the fairness assessment under New Jersey law, we build from the federal public/private person construct. We agree with the basic premise of the federal distinction between public and private persons: that the subjugation of the individual's reputational interest in favor of societal goals is most disturbing when the individual has involuntarily and unexpectedly become embroiled in a public matter. *See, e.g., Wolston v. Reader's Digest Ass'n, supra,* 433 *U.S.* 157, 99 *S.Ct.* 2701, 61 *L.Ed.*2d 450; *Hutchinson v. Proxmire, supra,* 433 *U.S.* 111, 99 *S.Ct.* 2675, 61 *L.Ed.*2d 411. However, in contradistinction from the federal view, we do not deem it unfair to favor free speech over the reputational interests of an individual who has voluntarily and knowingly engaged in conduct that one in his position should reasonably know would implicate a legitimate public interest, engendering the real possibility of public attention and scrutiny. While such an individual has not sought publicity, by willingly and knowingly engaging in conduct that exposes him to the risk of attention, he has relinquished part of his reputation to the public eye. *Cf. Curtis Publishing Co. v. Butts, supra,* 388 *U.S.* at 154, 87 *S.Ct.* at 1991, 18 *L.Ed.*2d at 1111. ("The courts have ..., especially in libel cases, investigated the plaintiff's position to determine whether he has a legitimate call upon the court for protection in light of his prior activities and means of self-defense.") In light of our stronger concern for speech on public matters, such

an individual is not unfairly burdened with a higher standard for actionable defamation.

In this case, concededly, plaintiff has not purposefully thrust himself into the spotlight of a public controversy and hence is not a First Amendment public figure. Nevertheless, he has voluntarily, and presumably knowingly, risked exposure on a subject-matter of legitimate public concern. Plaintiff founded FSB, and served as its President and Director for almost twenty years. He was therefore undoubtedly thoroughly and intimately conversant with all of the public and governmental interests that attend the banking industry. Plaintiff would know of course that banks are regularly examined and audited. Moreover, the transaction itself was fraught with public implications. Plaintiff received a large loan from FSB, secured by a mortgage; this occurred shortly after his retirement from official bank positions. Most people in the business and commercial world would expect that a large loan between a bank and its founder and former president would attract special scrutiny and examination. *See N.J.S.A.* 17:9A–72 (special guidelines for loans to bank directors or executive officers). Plaintiff, a sophisticated banker and businessperson, is also presumed to know that the possibility of special favors in such a situation, which concerns the general public, financial analysts, and the government, would invite close scrutiny and could attract media attention with the accompanying risk of inaccurate or false statements. Thus, the press's investigation into such a matter is not wholly unexpected or aberrational, and indeed, is to be encouraged. *Cf. Maressa v. New Jersey Monthly, supra,* 89 *N.J.* 176 (recognizing that newsperson's right to gather information implicates First Amendment).

We conclude that in such a case the interests of free speech justify, and fairness to individual reputation permits, application of a strict and high burden of proof to establish actionable defamation. This is encompassed by a standard akin to the "actual malice" standard of *New York Times v. Sullivan.* As most recently explained in the variant context of "fair com-

ment," "a plaintiff must establish that the publisher knew the statement to be false or acted in reckless disregard of its truth or falsity." *Dairy Stores, Inc. v. Sentinel Publishing Co.*, *supra*, 104 *N.J.* at 131.

The negligence standard adopted by the courts below is inappropriate in the context of a defamation action that focuses upon published matters of legitimate public concern involving a knowledgeable individual who exposes himself to the risk of possible publicity. The uniqueness, variability and complexity of the tort of defamation suggest the need for a more exacting standard of liability. One problem inherent in the negligence standard is the great uncertainty engendered in its application. "[I]f the common law concept of negligence is applied to defamation, the extent of a publisher's constitutional protection will depend on a jury's relatively unfettered, ex post facto appraisal of his conduct, and since the publisher has no way of knowing how large the jury will make the prohibited zone, he has no choice but to steer wide of it." Anderson, "Libel and Press Self-Censorship," 53 *Texas Law Review* 422, 460–61 (1975); *see also* L. Tribe, *American Constitutional Law*, § 12–13 at 645 (1978) (unpredictable results of jury application of negligence standard will cause press self-censorship). More critically, the jury flexibility inherent in the negligence standard "is dangerous inasmuch as jurors are likely to represent majoritarian attitudes toward unpopular speakers and ideas." L. Tribe, *supra*, § 12–13 at 645. Hence, the negligence standard, which provides needed flexibility in the area of physical torts, may serve as a tool of censorship in the context of free speech and defamation.

Courts from other jurisdictions, similarly concerned that the negligence standard's vagueness and unpredictable jury applications would cause the self-censorship the *New York Times* decision was designed to abrogate, have also embraced a higher burden than negligence for some private person plaintiffs involved in a matter of legitimate public concern. *See Gay v. Williams*, 486 *F.Supp.* 12 (D.Alaska 1979) (based upon pre-

*Gertz* Alaska state court decisions); *Walker v. Colorado Springs Sun, Inc.,* 188 *Colo.* 86, 538 *P.*2d 450 (1975), *cert.* denied *sub nom. Woestendiek v. Walker,* 423 *U.S.* 1025, 96 *S.Ct.* 469, 46 *L.Ed.*2d 399 (1975); *Chapadeau v. United Observer-Dispatch, Inc.,* 38 *N.Y.*2d 196, 379 *N.Y.S.*2d 61, 341 *N.E.*2d 569 (1975); *Peisner v. Detroit Free Press, Inc.,* 82 *Mich.App.* 153, 266 *N.W.*2d 693 (Mich.Ct.App.1978), aff'd and modified, 421 *Mich.* 125, 364 *N.W.*2d 600 (1984); *AAFCO Heating and Air Conditioning Co. v. Northwest Publications, Inc.,* 162 *Ind. App.* 671, 321 *N.E.*2d 580 (Ind.Ct.App.1975), *cert.* denied, 424 *U.S.* 913, 96 *S.Ct.* 1112, 47 *L.Ed.*2d 318 (1976). New Jersey's long-standing expressed concern for free speech likewise advises against the use of the negligence standard in the context of this case.

Admittedly, many jurisdictions have embraced a negligence standard for private person plaintiffs. *E.g., Foster v. Laredo Newspapers, Inc.,* 541 *S.W.*2d 809 (Tex.1976), *cert.* denied, 429 *U.S.* 1123, 97 *S.Ct.* 1160, 51 *L.Ed.* 2d 573 (1977); *McCall v. Courier-Journal and Louisville Times Co.,* 623 *S.W.*2d 882 (Ky.1981), *cert.* denied, 456 *U.S.* 975, 102 *S.Ct.* 2239, 72 *L.Ed.*2d 849 (1982). *See generally,* Annot., "State Constitutional Protection of Allegedly Defamatory Statements Regarding Private Individuals," 33 *A.L.R.* 4th 212 (1984) (reviewing state court reactions to *Gertz* ). The most frequently articulated reasons for employing a negligence standard refer to the Supreme Court's observations in *Gertz* that private persons most likely have inadequate "self-help" remedies in the press and have not invited public attention upon themselves by voluntarily foraying into a public controversy. *See, e.g., Stone v. Essex County News Papers, Inc.,* 367 *Mass.* 849, 857–859, 330 *N.E.*2d 161, 168 (1975). As noted, we find this reasoning inapplicable to persons who can be presumed to have the expectation that their otherwise private transactions could be a legitimate subject of public interest and comment or who have voluntarily entered transactions with public ramifications.

For substantially the same reasons we do not accept an intermediate standard of proof expressed by notions of gross negligence or recklessness. *See, e.g., Chapadeau v. United Observer-Dispatch, Inc., supra,* 38 *N.Y.*2d 196, 379 *N.Y.S.*2d 61, 341 *N.E.*2d 569. Gross negligence determinations, like evaluations of negligence, involve relatively unpredictable jury assessments. In other contexts, the intermediate burden expressed by terms such as gross negligence may serve a salutary purpose. Such a burden can protect mundane, commonplace and ordinary forms of human behavior, even though encompassing simple carelessness, while penalizing actions involving more egregious misconduct. *E.g., Mahoney v. Carus,* 102 *N.J.* 564 (1986) ("fireman's rule" does not bar suit for willful and wanton misconduct); *Foldi v. Jeffries,* 93 *N.J.* 533 (1983) (parental immunity inapplicable if parent willfully and wantonly failed to supervise child). But in these situations a jury is dealing with average human behavior and canvassing ordinary conduct that is well within the norm of everyday experience. In the context of defamation, however, it is not likely that average persons would easily recognize the vague and subtle difference between speech uttered negligently and that uttered recklessly.

Nor do we see this critically difficult task measurably simplified by resort to expert testimony. Expert testimony would be appropriate in those defamation cases when the litigation focuses on issues beyond the experience and comprehension of the average person. *See Kohn v. West Hawaii Today, Inc.,* 65 *Hawaii* 584, ——, 656 *P.*2d 79, 83 (1982) ("The determination of whether expert evidence is required in a private figure defamation action should be made on a case-by-case basis, depending on the nature of the issue to be decided and the evidence actually adduced on that issue.") In such cases, expert testimony regarding journalistic practices and customs may properly inform a jury, even when the burden of proof is actual malice. But experts cannot solve the problems of jury variance and possible censorship posed by the use of standards such as

negligence or gross negligence. Consequently, installing a gross negligence regime in defamation would burden the press with comparable problems of vagueness and unpredictability as with the negligence standard, without any benefit to plaintiffs forced to meet an indeterminably higher burden of proof. The standard thus additionally fetters a plaintiff's attempt to protect his reputation without any real enhancement of free speech values or benefit to the press.

■ We hold that when a private person with sufficient experience, understanding and knowledge enters into a personal transaction or conducts his personal affairs in a manner that one in his position would reasonably expect implicates a legitimate public interest with an attendant risk of publicity, defamatory speech that focuses upon that public interest will not be actionable unless it has been published with actual malice. We rest our holding on principles of common-law, *see Dairy Stores, Inc. v. Sentinel Publishing Co., supra,* 104 *N.J.* 125; therefore, we need not determine whether the result is similarly required under the state constitution. Accordingly, plaintiff, who obtained a large loan from the bank he founded and led for twenty years, must prove that defendants acted with actual malice in publishing the defamatory articles.

## V.

Defendants raise claims as to certain errors relating to the damages awarded plaintiff. We now address those in the event there is a retrial of the matter.[4]

---

[4]In anticipating the possibility of a retrial and addressing issues that would be relevant in that event, we also should advert to the availability of summary judgment proceedings in light of the discussion in *Dairy Stores, Inc. v. Sentinel Publishing Co., supra,* 104 *N.J.* at 133. This reference is timely in light of the legal principles that will govern a retrial of the matter, but we do not express any views as to the appropriateness of summary judgment, which shall of course depend on the state of the record.

## A.

Defendants contend that Sisler's $200,000 general damages recovery for injury to his reputation violates the tenets of *Gertz v. Robert Welch, Inc., supra,* 418 *U.S.* 323, 94 *S.Ct.* 2997, 41 *L.Ed.*2d 789, and thus should be reversed as a matter of law. In *Gertz,* the Supreme Court announced restrictions on the damages that could be awarded by the states, in order to ensure that "state remedies for defamatory falsehood reach no farther than is necessary to protect the legitimate interest involved." *Id.* at 349, 94 *S.Ct.* at 3012, 41 *L.Ed.*2d at 811. Accordingly, the Supreme Court ruled that presumed and punitive damages could not be awarded in the absence of a finding of *New York Times* malice.[5] The Court continued:

> It is necessary to restrict defamation plaintiffs who do not prove knowledge of falsity or reckless disregard for the truth to compensation for actual injury. We need not define "actual injury", as trial courts have wide experience in framing appropriate jury instructions in tort actions. Suffice it to say that actual injury is not limited to out-of-pocket loss. Indeed the more customary types of actual harm inflicted by defamatory falsehood include impairment of reputation and standing in the community, personal humiliation, and mental anguish and suffering. Of course juries must be limited by appropriate instructions and all awards must be supported by competent evidence concerning the injury, although there need be no evidence which assigns an actual dollar value to the injry. [*Id.* at 349–50, 94 *S.Ct.* at 3012, 41 *L.Ed.*2d at 811]

Defendants argue that plaintiff adduced no competent evidence at trial of "actual injury" to his reputation, and thus the $200,000 award for injury to his reputation was, in effect, an award of presumed damages and a violation of *Gertz.*[6]

---

[5] *Dun and Bradstreet Inc. v. Greenmoss Builders, Inc., supra,* 472 *U.S.* at 759–60, 105 *S.Ct.* at 2946, 86 *L.Ed.*2d at 604, has since clarified these restrictions as applying only to issues of public concern.

[6] The parties do not dispute the elements of plaintiff's proof regarding injury to his reputation. At the trial, plaintiff called six reputation witnesses. These witnesses testified that plaintiff's outstanding general reputation, as well as his excellent reputation in the horse-breeding, business, and banking communities, was unaffected by the publication of the three articles. Because these witnesses were Sisler's only "direct" evidence relevant to injury to his reputation, the Courier-News contends that there was no competent proof of actual injury.

■■ Injury to reputation, even more so than personal injury or mental anguish, which are both amenable to expert testimony, defies exact measurement. The type of direct testimony lacking here has traditionally been hard to produce; in fact, it was this difficulty that engendered the "presumed damages" doctrine. *See Id.* at 375, 94 *S.Ct.* at 3024, 41 *L.Ed.*2d at 825 (White, J., dissenting). However, the inherently amorphous quantification of libel damages potentially enables juries to vary damages awards in accordance with the popularity or unpopularity of the speaker or the view expressed. *See* Anderson, "Reputation, Compensation, and Proof," 25 *William & Mary L.Rev.* 747 (1984). Accordingly, a plaintiff should offer some concrete proof that his reputation has been injured. One form of proof is that an existing relationship has been seriously disrupted, reflecting the idea that a reputation may be valued in terms of relationships with others. *Ibid.* Testimony of third parties as to a diminished reputation will also suffice to prove "actual injury." Awards based on a plaintiff's testimony alone or on "inferred" damages are unacceptable.

Because of the elusive nature of such evidence, courts must scrutinize jury damages awards and weigh carefully the type and substance of reputation-injury evidence presented. Courts reviewing jury awards based on lesser evidential showings should be more scrupulous, and less hesitant about reducing the verdicts to conform with the evidence. While this practice might reduce libel awards, plaintiffs still retain the satisfaction of having their reputation vindicated publicly by a jury verdict.

■ Applying this standard, we find in this case plaintiff presented evidence that his relationship with Guida was permanently impaired by the Courier-News articles. Moreover, the jury found this evidence persuasive enough to justify an award for special damages. The jury was entitled to conclude from this evidence that plaintiff suffered general injury to his reputation, over and above that manifested in the isolated transactions for which it awarded the special damages.

## B.

Plaintiff recovered $850,000 in special damages for the lost opportunity to stand the three standardbred horses at Apt-to-Acres. Defendants assert that this should be overturned as a matter of law. The gravamen of this claim is that plaintiff, as a shareholder of the Apt-to-Acres corporation, cannot recover damages that were sustained by the corporation. Additionally, since the trial court dismissed Apt-to-Acres as a corporate plaintiff, the corporation itself could not recover special damages in this suit, and therefore all claims for special damages from the lost opportunity to stand the horses must be dismissed.[7]

Neither the trial court nor the Appellate Division granted defendants' motion to dismiss all special damages claims. The trial court agreed with the defendants that the plaintiff could not recover for losses suffered by his corporation, but ruled that Sisler could present proofs pertaining to corporate losses as evidence of his own special damages. In refusing defendants' motion for judgment *n.o.v.* the trial court explained that,

[w]hile he could not recover what the corporation lost, the lost corporation [sic] was some evidence of damage to the individual shareholder, who was a 100% stockholder of a corporation. While there might be a basis of uncertainty as to

---

[7]This contention and its accompanying confusion exist because of several tactical maneuvers by both parties at the initial stages of this litigation. At trial, both parties consented to the dismissal of Apt-to-Acres as corporate plaintiff on the ground that the corporation itself had not been libeled by the Courier-News' articles. Plaintiff had named the corporation as a co-plaintiff only to insure the survival of the libel cause of action in the event that plaintiff died, since the law at the time the suit was instituted indicated that the death of a libel plaintiff terminates the libel cause of action. When a subsequent Federal District Court decision held that under New Jersey law a libel action would survive the death of the plaintiff, Sisler had no objection to dismissing Apt-to-Acres as a co-plaintiff. *See MacDonald v. Time*, 554 *F.Supp.* 1053 (D.N.J.1983); *see also Canino v. New York News, Inc.*, 96 *N.J.* 189 (1984) (confirming *MacDonald* interpretation of New Jersey law). After Apt-to-Acres was dismissed as a party, the defendants moved to have all claims for special damages dismissed, maintaining, as they do now, that plaintiff shareholder cannot recover directly for damages sustained by his corporation.

determining the amount of such loss, it was my conclusion then and opinion now that there was no uncertainty as to the fact of certain losses to the sole stockholder of the corporation.

In those circumstances I believe the jury has the right to make an assessment based upon all of the evidence as to what they consider appropriate loss to the individual shareholder.

The Appellate Division similarly agreed with defendants' proposition regarding the inability of a shareholder to assert a corporation's rights, but also upheld the trial court's ruling, noting that here "plaintiff's personal rights were infringed upon and the only corporate effect was the loss of profits which would have inured to plaintiff's benefit as sole shareholder." 199 *N.J.Super.* at 328. The court concluded that "insofar as the losses were corporate losses, the corporate plaintiff should have remained in the case but since the losses have been demonstrated and assessed by the jury on behalf of the sole stockholder, we see no reason to reverse or remand for a new trial." *Ibid.*

Although case law supports defendants' assertion that a shareholder, even a 100% stockholder, cannot recover under a cause of action for defamation that lies with the corporation, *see McBride v. Crowell-Collier Publishing Co.*, 196 *F.*2d 187 (5th Cir.1952); *Church of Scientology of California v. Flynn*, 578 *F.Supp.* 266 (D.Mass.1984), this "established rule" is largely irrelevant to this case. If Apt-to-Acres was not libeled, as the parties assumed, then the corporation would not have had a cause of action to assert. Accordingly, plaintiff was not attempting to assert rights that belong to the corporation. Rather, it was plaintiff, the stockholder, who was libeled, and it was he who lost the business opportunities that comprise the special damages claim. The role of the corporation in this case was "after-the-fact" of the libel. Plaintiff merely chose to funnel the business opportunities that were lost through his wholly-owned corporation, and thus, evidence of what the corporation lost was correctly deemed to be evidence of plaintiff's personal losses.

Even if Apt-to-Acres is viewed as having sustained the special damages, plaintiff would still be entitled to recovery. The parties had agreed that the corporate plaintiff, Apt-to-Acres, had not been defamed by the Courier-News articles. But if the damages were sustained by Apt-to-Acres, as defendants contend, then the corporation must also be viewed as the libeled party. The last Courier-News article did imply, at least to Guida, that Apt-to-Acres was financed by under-collateralized loans. It was the spectre of Apt-to-Acres' alleged financial instability that caused Guida to terminate the negotiations for the horses. Since the articles deterred Guida from dealing with Apt-to-Acres, arguably Apt-to-Acres suffered the libel and sustained the damages and could be reinstated as plaintiff and awarded $850,000 in special damages. *See Restatement 2nd of Torts* § 561; *see also Advanced Training System v. Caswell Equipment Co.*, 352 *N.W.* 2d 1, 10 (Minn.1984) ("to recover in libel, a corporation must show that defendant's written statements directly tended to affect the credit, property, or business of the corporate plaintiff"). However, in view of our disposition of the appeal, it is unnecessary to rule definitively on this claim.

## C.

Although plaintiff received a favorable verdict at trial, he cross-appealed here and below claiming that several trial errors reduced the amount of the jury award.[8] However, because we

---

[8]Specifically, plaintiff contends error in: (a) the exclusion of Sisler's recollection of conversations with Louis Guida concerning standing certain horses at Sisler's farm; (b) the trial judge's jury instructions on proximate cause; (c) the dismissal of his claim for mental anguish and humiliation; (d) the failure to submit his claim for punitive damages to the jury; and (e) the dismissal of the parent corporation, Gannett Company, as a co-defendant. Plaintiff conditioned his cross-appeal on the guarantee that a retrial on one or more of the issues would not disturb his original award. The Appellate Division ruled that Sisler had effectively withdrawn his cross-appeal claims for compensatory damages by limiting his new trial request to one that would not prejudice his initial jury award. It is similarly unnecessary to resolve this issue.

today remand the matter for determination under a different burden of proof, the issues raised by plaintiff may not recur or may be cast in a different evidentiary light at retrial. Resolution of plaintiff's claims is thus obviated.

## VI.

It is our conclusion that the plaintiff must establish defamation against defendants by establishing actual malice in the publication of the offending articles. For that reason, the jury verdict awarding damages must be set aside and the judgment below reversed. The matter is remanded for retrial in accordance with this opinion.

GARIBALDI, J., concurring.

The primary issue in this case is the appropriate standard of care to impose upon a media defendant in a libel action brought by a private individual for a defamatory statement concerning a public matter. The majority imposes the standard of actual malice set forth in *New York Times v. Sullivan*, 376 *U.S.* 254, 84 *S.Ct.* 710, 11 *L.Ed.*2d 686 (1964).

I disagree. The majority's position extends the use of the strict *New York Times* standard too far and strikes an improper balance between a private person's interest in his reputation and the press's first amendment freedoms. I too am committed to an uninhibited, robust, and free press. However, the practical effect of the application of the *New York Times* standard has been to prevent the plaintiff from recovering in nearly all defamation cases in which the standard has been applied. Eaton, "The American Law of Defamation Through Gertz v. Robert Welch, Inc. and Beyond: An Analytical Primer," 61 *Va.L.Rev.* 1349, 1375 (1975); L. Tribe, *American Constitutional Law*, 638–640 (1978). Indeed, the U.S. Supreme Court continues to place *additional* burdens on plaintiffs who must

prove actual malice.[1]   Thus, applying the *New York Times* standard to a private person affords an individual no practical way to protect his reputation.

Even in cases where the *New York Times* standard is not at issue, the U.S. Supreme Court has imposed substantial constitutional restrictions before a private figure plaintiff can recover damages in defamation actions.  In *Gertz v. Robert Welch, Inc.*, 418 *U.S.* 323, 94 *S.Ct.* 2997, 41 *L.Ed.*2d 748 (1974), the Court invalidated the prevailing common-law standard and held that even when private figures are involved, the constitutional requirement of fault supersedes the common-law presumptions as to fault and damages.  Under *Gertz*, states may no longer impose liability without fault, but may define the level of fault required for recovery by private persons, at least where substantial damage to reputation is apparent on the face of the defamatory statement.  Nonetheless, *Gertz* requires that in order for a private-figure plaintiff to recover presumed or punitive damages he or she must meet the *New York Times* actual malice standard.[2]   Recently in *Philadelphia Newspapers*

---

[1] In *Bose Corp. v. Consumers Union of United States, Inc.*, 466 *U.S.* 485, 104 *S.Ct.* 1949, 80 *L.Ed.*2d 502 (1984), the Court held that an appellate court must perform a *de novo* review of a trial court's actual malice determination in order to ascertain whether there was clear and convincing evidence of that actual malice.  The court found that a review by the clearly erroneous standard of Rule 52(a) of the Federal Rules of Civil Procedure was not adequate. This term in *Jack Anderson v. Liberty Lobby, Inc.*, —— *U.S.* ——, 106 *S.Ct.* 2505, 91 *L.Ed.*2d 202 (1986), the Court held that a court ruling on a motion for summary judgment may dismiss libel suits without a trial unless the plaintiff provides clear and convincing evidence of malice.  *Cf. Herbert v. Lando*, 441 *U.S.* 153, 99 *S.Ct.* 1635, 60 *L.Ed.*2d 115 (1979), in which the Court held that in discovery a public official could ask a defendant journalist about his or her state of mind when publishing the alleged defamatory falsehood to seek to establish the "actual malice" of the defendant.

[2] *Dun & Bradstreet Inc. v. Greenmoss Builders, Inc.*, 472 *U.S.* 749, 105 *S.Ct.* 2939, 86 *L.Ed.*2d 593 (1985), a plurality of the Court determined that in a libel action brought by a private individual involving a defamatory statement of purely private concern, the plaintiff need not show actual malice in order to recover punitive damages.

*Inc. v. Hepps,* —— *U.S.* ——, 106 *S.Ct.* 1558, 89 *L.Ed.*2d 783 (1986), the Court again imposed additional restrictions holding that a private-figure plaintiff must bear the burden of showing that the speech at issue is false before recovering damages for defamation from a media defendant.[3]

Given these substantial constitutional and statutory restrictions, I believe that private-figure plaintiffs should be allowed to recover if they show that the conduct of the media defendant, measured against the conduct of a reasonable and prudent media figure acting under similar circumstances, was negligent. Such a standard would preserve an individual's right to recover actual damages for loss to his reputation by the publication of a false statement, while it would still protect the right of the public to a free and uninhibited press.

I

Today the Court takes New Jersey libel law in a new direction that is contrary to the decisions of the U.S. Supreme Court and the majority of states. Despite its acknowledgement that Sisler is a private figure, the Court holds that because he "has voluntarily and knowingly engaged in conduct that one in his position should reasonably know would implicate a legitimate public interest, engendering the real possibility of public attention and scrutiny," he will be allowed to recover actual damages only if he establishes actual malice.[4] *Ante* at 272.

---

[3]In *Philadelphia Newspapers, Inc.,* the Court also recognized that plaintiff's burden was weightier because of Pennsylvania's shield law which allows media employees to refuse to divulge their sources. Of course, New Jersey likewise has a strong shield law, *N.J.S.A.* 2A:84A–21; *State v. Boiardo,* 82 *N.J.* 446 (1980); *In re Maressa v. New Jersey Monthly,* 89 *N.J.* 176 (1982); *In re Farber,* 78 *N.J.* 259 (1978). This affords the press an additional statutory protection and provides a further obstacle to the private-figure plaintiff seeking to recover in a libel action.

[4]Under *Gertz,* even a private figure to establish presumed or punitive damages still must establish actual malice. *Gertz v. Robert Welch, Inc.,* 418 *U.S.* 323, 94 *S.Ct.* 2997, 41 *L.Ed.*2d 789 (1974).

The Court bases this conclusion not on the New Jersey Constitution but on New Jersey common law. As evident from the Court's own analysis of New Jersey case law, *ante* at 273, prior to this decision and our decision today in *Dairy Stores, Inc. v. Sentinel Publishing Co.*, 104 *N.J.* 125 (1986), we have never imposed the *New York Times* actual malice standard on a private figure who has not assumed the risk of publicity by voluntarily thrusting himself into the public spotlight.

The majority's approach does not properly balance the interest of the public in preserving a free press and the interest of a private individual in protecting his reputation. In its equation, the majority undervalues the importance of a person's interest in his good name. As Justice Stewart eloquently stated in his concurrence in *Rosenblatt v. Baer*, 383 *U.S.* 75, 92–94, 86 *S.Ct.* 669, 679–80, 15 *L.Ed.*2d 597, 609–610 (1966);

> The right of a man to the protection of his own reputation from unjustified invasion and wrongful hurt reflects no more than our basic concept of the essential dignity and worth of every human being—a concept at the root of any decent system of ordered liberty.

> ... The First and Fourteenth Amendments have not stripped private citizens of all means of redress for injuries inflicted upon them by careless liars. The destruction that defamatory falsehood can bring is, to be sure, often beyond the capacity of the law to redeem. Yet imperfect though it is, an action for damages is the only hope for vindication or redress the law gives to a man whose reputation has been falsely dishonored.

> Moreover, the preventive effect of liability for defamation serves an important public purpose. For the rights and values of private personality far transcend mere personal interests. Surely if the 1950's taught us anything, they taught us that the poisonous atmosphere of the easy lie can infect and degrade a whose society.

In essence, the majority is adopting the repudiated doctrine of *Rosenbloom v. Metromedia*, 403 *U.S.* 29, 91 *S.Ct.* 1811, 29 *L.Ed.*2d 296 (1971). There the Supreme Court extended the *New York Times* standard to all libel actions, regardless of a plaintiff's status, so long as the defamatory statement relates to matters of "public or general interest." Three years later, the Court, realizing it had extended the requirement of actual malice too far, reversed itself in *Gertz*.

The Supreme Court's decision in *Gertz* represents a sounder accommodation between the competing interests of the press and the individual. Because private persons lack "access to the channels of effective communication ... to counteract false statements" and because they have "relinquished no part of [their] good name[s]" by "thrust[ing] themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved," the Court held that private persons are entitled to greater protection than public ones. *Gertz,* 418 *U.S.* at 344–45, 94 *S.Ct.* at 3009, 41 *L.Ed.*2d at 808.[5]

Since *Gertz,* the controlling factor in determining the standard of care to be used in a libel case is the status of the individual—whether a public figure or a private figure. *See, e.g., Time, Inc. v. Firestone,* 424 *U.S.* 448, 96 *S.Ct.* 958, 47 *L.Ed.*2d 154 (1976) (wife of a wealthy Palm Beach socialite involved in a much-publicized divorce was not a public figure simply because her affairs were of interest to the public and hence the media defendant was not entitled to the actual malice standard); *Hutchinson v. Proxmire,* 443 *U.S.* 111, 99 *S.Ct.* 2675, 61 *L.Ed.*2d 411 (1979) (public controversy into which plaintiff may thrust his or her personality must pre-exist the defamatory publication. "Those charged with defamation can-

---

[5] Private persons are in a very different position when they are criticized. They have not chosen the rigors of public life: assumed the risk of injury, as it were. And their opportunities to rebut criticism are slimmer. Justice Harlan had them in mind when he said the marketplace was the best testing ground for truth "where it functions." It does not function for the private person, because no one is interested in listening to him, and Justice Harlan warned against "the dangers of unchallengeable untruth." For these reasons the Supreme Court seems to me to have got the balance of interests about right when it decided in *Gertz* that the states could allow private plaintiffs to recover for libel on any standard except liability without fault: The publisher, that is, must be shown at least to have been negligent in publishing a falsehood.

Lewis, *"New York Times v. Sullivan* Reconsidered: Time to Return to 'The Central Meaning of the First Amendment,'"* 83 *Col. Law Rev.,* 603, 622 (1983).

not, by their own conduct, create their own defense by making the claimant a public figure." *Id.* at 135, 99 *S.Ct.* at 2688, 61 *L.Ed.*2d at 431); *Wolston v. Reader's Digest Ass'n, Inc.*, 443 *U.S.* 157, 99 *S.Ct.* 2701, 61 *L.Ed.*2d 450 (1979) (merely because events involving a private individual attract public and media attention does not make that private individual a public figure. A libel defendant must show more than mere newsworthiness to justify application of the demanding burden of the *New York Times.*).

Courts generally recognized that "a fairly high threshold of public activity is evidently necessary for a finding that a person has voluntarily plunged into a public controversy." L. Tribe, *American Constitutional Law* 645 (1978). Here, however, the majority labels the plaintiff as a public figure even though it simultaneously acknowledges that he: has not attained special prominence in the affairs of society; has not thrust himself to the forefront of particular public controversies in order to influence the resolution of the issues involved; does not command a substantial amount of independent public interest; has not achieved pervasive fame or notoriety even in the Franklin Township area; and, finally, has not sought attention in the public controversy. In fact, the majority states that particularly since his retirement, the "plaintiff has avoided publicity concentrating on his private business affairs." *Ante* at 269. In short, despite the majority's facile label, Sisler has none of the characteristics of "a public figure" under federal constitutional analysis and hence under federal law would not have to prove actual malice in order to recover actual damages.

What then has Sisler done to deserve this extra burden, the necessity of establishing the *New York Times* actual malice standard, in order to recover for actual damages to his reputation? I submit that he has done nothing. I find little merit to the majority's contention that Sisler's conduct, the perfectly legal transaction of borrowing money from a bank in which he

was a former officer,[6] is of such import that Sisler "relinquished part of his reputation to the public eye." Sisler remains a private person. Thus, I submit that it is not what Sisler has done but merely because the defamatory statement concerns a matter of public concern that the majority forces him to adhere to the stricter standard. The mere fact that the press is attracted to Sisler's activities does not make him, and should not make him, a public figure. As the Court in *Gertz* concluded, the extension of the New York Times test" to every item of public interest "would abridge this legitimate state interest [protection of a person's reputation] to a degree that we find unacceptable." *Gertz v. Robert Welch*, 418 *U.S.* at 346, 94 *S.Ct.* at 3010, 41 *L.Ed.*2d at 809.

The majority's decision has broad ramifications. It will affect all former bank officials and directors, as well as former officers and directors of other regulated industries or high-profile corporations, in dealing with their companies. The following come within the majority's conception of a semi-public figure: attorneys who take cases with a high profile or involving unpopular causes, *see Gertz v. Robert Welch*, 418 *U.S.* 323, 94 *S.Ct.* 2997, 41 *L.Ed.*2d 748; individuals who receive awards from the government or well-known private organizations, *see Hutchinson v. Proxmire*, 443 *U.S.* 111, 99 *S.Ct.* 2675, 61 *L.Ed.* 2d 411; as well as people who simply seek to defend themselves in lawsuits, *see Time, Inc. v. Firestone*, 424 *U.S.* 448, 96 *S.Ct.* 958, 47 *L.Ed.*2d 154.

Aside from inadequately protecting a private individual's reputation, there are other serious flaws with the notion of a "semi-public figure." The introduction of a new undefined variable into an already confused field can result only in greater uncertainty in this area of the law. This unpredictability will be compounded by the fact that this is a new standard, differ-

---

[6]*N.J.S.A.* 17:9A–72 sets forth guidelines that permit banks to make loans to its *current* directors and officers. The statute imposes no restrictions on loans by banks to its *former* directors or officers.

ent from the federal private/public dichotomy. Moreover, this new creation of the majority sets forth no defined guidelines to determine whether a private person will be deemed a "semi-public" person. It concludes only that the process will develop on a case-by-case basis. While the majority may know a "semi-public figure" when it sees him or her, I am not sure that either the media or the legal profession will. Where we can discern generally applicable rules, I think that they should be preferred to the majority's approach, which subjects both the public and the press to unpredictable second-guessing of the judiciary.

## II

The question remains what standard of liability should apply to a defamatory statement about a private individual relating to a matter of public concern in order to best protect the freedom of the press and the good name of the citizen. The majority of states that have considered the issue after *Gertz* have adopted some variant of the ordinary negligence standard. *See* Restatement (Second) of Torts § 580B, appendix and reporter's notes (1976); *Sisler v. Courier-News Co.*, 199 *N.J. Super*, 307, 314–15 (App.Div.1985). Four states have adopted a higher standard than negligence.[7] The Restatement likewise has adopted a negligence standard for the defendant who defames a private person, regardless of whether the matter concerns a public or private issue.[8]

---

[7]Four states, Alaska, Colorado, Michigan and Indiana, have applied the actual malice test to private persons. New York has adopted a gross negligence standard. *Chapadeau v. Utica Observer-Dispatch, Inc.*, 38 *N.Y.*2d 196, 379 *N.Y.S.*2d 61, 341 *N.E.*2d 569 (1975); *Karaduman v. Newsday, Inc.*, 51 *N.Y.* 2d 531, 435 *N.Y.S.*2d 556, 416 *N.E.*2d 557 (1980).

[8] § 580 B. Defamation of Private Person
One who publishes a false and defamatory communication concerning a private person, ... is subject to liability, if, but only if, he
(a) knows that the statement is false and that it defames the other,
(b) acts in reckless disregard of these matters, or

Mindful of the already substantial constitutional restrictions placed on a private-figure libel plaintiff, I would allow recovery upon proof by a clear preponderance of evidence that the media defendant was negligent in making the false and defamatory statement.[9] As an additional safeguard to the press, I would define the media defendant's standard of conduct by reference to the conduct of the reasonably prudent media defendant in the community or in a similar community under similar circumstances. Under this standard, media defendants will be held to the skill, knowledge, and experience normally exercised by members of that profession.

Specifically, I would consider "the medium, the size and location of the publisher or broadcaster, its resources and technological capabilities, and deadline pressures." L. Tribe, *American Constitutional Law* 646 (1978); Anderson, "Libel and Self-Censorship," 53 *Tex.L.Rev.* 422 (1975). It would be unfair to impose the journalistic practices of a large urban newspaper on a small weekly paper and vice-versa. Among the key factors would be time. The thoroughness of the check that a reasonable journalist would make before publishing the statement may depend on whether the communication was a matter of topical news requiring prompt publication to be useful, or one in which time and opportunity to investigate were ample.

---

(c) acts negligently in failing to ascertain them.
*Restatement (Second) of Torts* § 580B (1976).

[9]The *Gertz* court held that a publisher is not subject to liability from negligence based on a publication the content of which does not warn a reasonably prudent editor or broadcaster of its defamatory potential. In such a case, the *New York Times* standard would have to be established in order to receive compensatory damages. Thus, the mere negligent error or careless mistatement of fact that on its face does not appear defamatory will not result in liability for a media defendant.

In the latter situation, due care may require a more thorough investigation. *Restatement (Second) of Torts* § 580B.[10]

I am aware of the concerns of critics who fear that the imposition of such a reasonably-prudent-media-defendant standard would favor only the orthodox papers and create unwelcome pressure for uniformity. However, I believe that these fears are greatly exaggerated. Many of the dangers are substantially alleviated when the defendant is judged by standards of publishers of comparable resources, deadline pressures, space limitations, and technological capabilities. Moreover, similar pressures apply to negligence cases involving new and unorthodox medical treatment or legal theories. In those cases, as here, we can safely entrust decisions to juries whose members will be able to weigh all of the factors depending on the circumstances of the case.

### III

The majority fears that use of a lesser standard than actual malice would have a chilling effect upon freedom of the press. On the contrary, I believe that a reasonably-prudent-media-defendant standard would have little, if any, practical effect on the functioning of responsible journalism.

The judicial muzzle that the press feared before and after *New York Times* fortunately has not materialized. First, the *Gertz* limitations, particularly the removal of the specter of presumed and punitive damages in the absence of the *New York Times* standard, "eliminates significant and powerful motives for self-censorship that otherwise are present in the traditional libel action. By so doing, the Court leaves what should prove to be sufficient and adequate breathing space for

---

[10]As in other cases requiring the evaluation of professional conduct, the customs and practices within the trade would be relevant, but not controlling. *Restatement (Second) of Torts* § 530(b) comment g (1977). Normally, expert testimony is introduced to establish professional customs. However, media defendants would not have to present an expert but could establish professional journalistic practices through the testimony of their own staff.

a vigorous press." *Gertz v. Robert Welch,* 418 *U.S.* at 354, 94 *S.Ct.* at 3014, 41 *L.Ed.*2d at 813 (Blackmun, J., concurring.)

Second, experts in the area of defamation law believe that even with the *New York Times* rule as it is applied here today, there is still a self-censorship effect because of the inherent costs of defamation litigation. *See* Lewis, *"New York Times v. Sullivan* Reconsidered: Time to Return to 'The Central Meaning of the First Amendment,'* " 83 *Col.R.Rev.* 603 (1983). Precisely because our press is the freest in the world, the amount of libel litigation continues to grow along with increasing judgments and costs. It is the magnitude of the financial burden more than any other factor that makes libel a threat to the press today. Anderson, "Libel and Press Self-Censorship," 53 *Tex.L.Rev.* 422, 436 (1975). There probably will be little difference in the costs to the press of defending a libel action under the negligence standard as contrasted with the actual malice test.[11] Under both standards, not only the press but also the defamed individual has to devote substantial resources and time, and emotional energy in a libel action. It is the costs to the defamed individual that the majority ignores.

Furthermore, many commentators agree that a motion for summary judgment should be no less available under a negligence standard than under the *New York Times* standard. Anderson, *supra,* 53 *Tex.L.Rev.* at 469 (1975). As explained by Professor Tribe:

Short of an absolute privilege to defame which would accord no weight to society's pervasive interest in preserving reputation, the most efficacious strat-

---

[11]Whether the standard is actual malice or negligence, the costs of a libel action to both the plaintiffs and defendants are tremendous. Thus, both sides have an interest in finding a better way to accommodate the concerns of the press and the injured individual. I agree with these commentators who believe that the paramount interest of the person defamed is to restore his or her good name. To that end, I believe that the elimination of presumed and punitive damages serves a salutory purpose. Additionally, the Legislature, in consultation with experts in this area of the law, should work toward developing feasible alternatives to the traditional full-fledged libel action.

egy to reduce self-censorship may be liberal use of summary judgment procedures in defamation actions, so as to avoid long and costly litigation. There is no reason summary judgment should be less available under *Gertz* than under *New York Times*, at least after the substance of the *Gertz* "fault" standard has become apparent. Thus *Gertz* seems justifiable in broad outline as an accommodation making it easier for aggrieved individuals to obtain redress of reputational injuries without significantly affecting the level of self-censorship by the press. L. Tribe, *American Constitutional Law* 642–43 (1978).

Given the already substantial constitutional restrictions imposed on a private-figure plaintiff to recover in a libel suit, I do not perceive any intolerable burden to freedom of speech or press to impose a duty of reasonable care upon those who exercise those freedoms. In today's world, the media can have a considerable impact on the life and livelihood of an individual. Neither the intentional lie nor the negligent error substantially advances society's interest in a free and uninhibited press.

Most reporters are responsible and careful. Thus, requiring the news media to use due care in gathering and reporting in areas where there is a particular danger of damaging an individual's reputation should not prove an undue burden on the press, particularly when such negligence is to be determined by the conduct of the reasonably prudent publisher or broadcaster in the community or under similar circumstances. True, under this standard greater care would have to be exercised with respect to private-figure plaintiffs, but this is justifiable as a proper balance between the interests of the press and the interests of a private citizen.

IV

Applying a reasonably prudent media defendant standard to this case, I would find that the plaintiff has established that the statement was false and that it presented a substantial danger to his reputation. By defendants' own admission, it appears that their conduct was negligent, and not in accordance with generally acceptable journalistic practices. No evidence, however, was specifically introduced to prove that the defendants' acts were less than those expected of responsible journalists.

Therefore, the defendants should have a right to be tried under the reasonably-prudent-media-defendant standard. Accordingly, I would concur in the majority's decision to remand the matter for retrial, but unlike the majority, I would hold that the plaintiff may establish defamation against the defendants by simply establishing that their conduct was negligent, as measured by the conduct of a reasonably prudent media figure acting under similar circumstances.[12]

GARIBALDI, J., concurring in the result.

*For reversal and remandment*—Chief Justice WILENTZ, and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.

*For affirmance*—None.

---

[12]On remand, Sisler's claims for mental anguish and humiliation and punitive damages would also have to be addressed.