751 A.2d 1066 (2000)
331 N.J. Super. 303
Captain Michael W. McLAUGHLIN, Plaintiff-Respondent,
v.
ROSANIO, BAILETS & TALAMO, INC., Defendant-Appellant, and
William J. Simon, Edmond Bonnette, Jerry Errigo, Jane Fitzpatrick and Steven D'Andrea, Defendants.
Superior Court of New Jersey, Appellate Division.
Argued February 28, 2000.
Decided May 17, 2000.
*1068 Richard S. Hyland, Cherry Hill, for defendant-appellant (Montgomery, McCracken, Walker & Rhoads, attorneys; Mr. Hyland and Stacy Alison Fols, on the brief).
William M. Tambussi, Westmont, for plaintiff-respondent (Brown & Connery, attorneys; Mr. Tambussi and Louis R. Lessig, on the brief).
Before Judges HAVEY, KEEFE and A.A. RODRÍGUEZ.
*1067 The opinion of the court was delivered by HAVEY, P.J.A.D.
In this defamation case, the issue is whether the presumption of damage to reputation as provided under the slander per se doctrine should apply when the defamation occurs during a political radio commercial.
Defendant Rosanio, Bailets & Talamo, Inc. (RB & T) was the campaign media consultant for defendant William J. Simon during his 1994 campaign for Sheriff of Camden County. Simon, the Republican candidate, ran a commercial accusing plaintiff Michael McLaughlin, the Democratic candidate, of having leaked confidential information to the Scarfo crime family when plaintiff was a member of the State Police. The commercial referred to an interview that plaintiff, while still a State Police detective, had granted to a reporter, resulting in a newspaper story that revealed confidential information about the State Police investigation of Scarfo.
Plaintiff filed a complaint in the Law Division alleging that defendants had defamed him in the radio commercial. Simon *1069 and RB & T moved for summary judgment, alleging that the claimed defamatory statement was protected political speech that was not uttered with "actual malice," and that it had not caused any actual damage to plaintiff's reputation.[1] Plaintiff cross-moved for partial summary judgment. The motion judge determined that: (1) the radio ad was "slander per se" and thus plaintiff need not prove actual damages; and (2) whether defendants were motivated by "actual malice" in defaming plaintiff, a public figure, was a disputed question of fact that must be decided by a jury. Accordingly, the judge denied defendants' motion and granted partial summary judgment to plaintiff on the question of whether the statement constituted slander per se.
A jury trial resulted in a verdict in favor of plaintiff. In response to special verdict interrogatories, the jury concluded that: (1) the challenged statement was "substantially false"; (2) both Simon and RB & T made the statement "with actual knowledge that it was false or with a reckless disregard of whether it was true or false when it was communicated"; (3) Simon's fault was sixty percent and RB & T's was forty percent; (4) plaintiff's damage to his reputation, including any emotional distress, totaled $40,000; and (5) plaintiff was entitled to punitive damages against both defendants. Trial continued on the amount of punitive damages. The jury returned a verdict assessing $250,000 in punitive damages against each defendant.
We reverse. To succeed in an action for slander, plaintiff must prove that the defamatory statement caused "actual harm to reputation through the production of concrete proof." Ward v. Zelikovsky, 136 N.J. 516, 540, 643 A.2d 972 (1994). This damage element of a prima facie case of defamation is waived if the statement is slander per se, because damage to reputation is presumed to flow from such statements. Ibid. We decline to apply the slander per se doctrine to the statement involved here. The doctrine has been "severely criticized" as allowing compensation when there is no injury. Biondi v. Nassimos, 300 N.J.Super. 148, 154-55, 692 A.2d 103 (App.Div.1997). Thus, it should not be expanded to cover a statement, such as the one here, which should be categorized as libel, rather than slander. Consequently, the motion for summary judgment should have been granted on the ground that plaintiff failed to establish any reputational injury or other special damages.
The facts are not in dispute. In 1985, the New Jersey State Police was investigating the organized-crime activities of Nicodemo Scarfo, culminating in indictments of Scarfo and others. At that time plaintiff was the head of the State Police's Bellmawr Intelligence Unit, which conducted electronic surveillance of the Ocean City home of Thomas DelGiorno, a suspected member of Scarfo's crime family who was subsequently indicted. The surveillance revealed that DelGiorno had "fallen out of favor with Scarfo and it was felt that he might be the target of a mob murder."
In November 1986, plaintiff arrested DelGiorno and attempted to solicit his help in gathering evidence against other members of the crime family; DelGiorno agreed to cooperate. The State Police assigned plaintiff to arrange protective custody for DelGiorno and his family.
In spite of efforts to keep DelGiorno's cooperation a secret, on December 7, 1986, the Courier-Post published a front-page article by reporter Dennis M. Culnan disclosing DelGiorno's cooperation with state prosecutors. The article, citing unnamed sources characterized as "close to the investigation," *1070 and "familiar with the debriefing of DelGiorno," reported that DelGiorno had tied Scarfo to sixteen murders, some involving DelGiorno, and that DelGiorno and his family were being guarded by State Police in a "secret location."
State Police officials were troubled that Culnan's article could jeopardize the investigation and place several people in danger. They suspected that the leak came from one of five named officers, one of whom was plaintiff. Accordingly, Superintendent Pagano ordered an internal investigation, during which the five suspects and many other witnesses were interviewed. In a report issued in March 1987, the State Police found that plaintiff had been the one who improperly disclosed the information to Culnan, and that he had misrepresented that fact during the internal investigation.
Based on the foregoing report, in April 1987, disciplinary charges were filed against plaintiff. Specifically, plaintiff was charged with violating State Police rules and regulations by knowingly making false and misleading official statements concerning the content and duration of his telephone conversation with Culnan, and disclosing information "not generally available" to the public, acquired by plaintiff in the course of his official duties. Plaintiff entered a guilty plea to both charges and was suspended for a four-month period.
In March 1994, plaintiff agreed to run for Camden County Sheriff on the Democratic ticket. He began campaigning in April 1994, the day after he retired from the State Police. During the campaign defendant William J. Simon, the incumbent, learned about the 1987 disciplinary charges against plaintiff from "material addressed to [his] home anonymously."
Based on the information contained in the anonymous package, the Simon campaign prepared a radio commercial that aired on five stations in October 1994. The script of the commercial, as printed in a later news story about the controversy, read as follows:
Voice No. 1: Order ... order in the court.
Voice No. 2: We find the defendant, Michael W. McLaughlin, guilty ... On the second count we find the defendant Michael W. McLaughlin guilty and I order him immediately suspended from the N.J. State Police.
Voice No. 3: Michael McLaughlin is the Democratic candidate for Camden County Sheriff ... He wants you to trust him to be the highest-ranking law enforcement official in Camden County. But how far can you trust a man who breaks the rules of the New Jersey State Police... And then tries to cover it up? When he was a State Trooper, Mike McLaughlin jeopardized an organized crime investigation by leaking confidential information to the Scarfo crime family syndicate. For this he was found guilty and suspended by the N.J. State Police.
That was bad enough. But then he was found to have made "false and misleading statements" about the incident to the State Police's own internal affairs bureau. We have enough problems with our criminals ... The last thing we need is problems with our cops. The choice is clear. We're safe with Simon. On Nov. 8, put your vote in the first column and keep Bill Simon on the job.
Simon: Paid for by the Friends of Bill Simon.
[Emphasis added.]
Steven D'Andrea, a professional political consultant who was serving as a Simon campaign volunteer, wrote the first draft of the script. According to D'Andrea, Simon had asked him to meet with two State Troopers to corroborate the anonymous information. D'Andrea did so, and the troopers confirmed that plaintiff had leaked the information to the newspaper. The troopers "[m]ight have" said that plaintiff leaked information to the Scarfo family.
*1071 D'Andrea sent the draft to RB & T, the firm in charge of public relations for the campaign. He did not remember who added the Scarfo reference, but he "[m]ight have." D'Andrea left the campaign at the end of September.
According to RB & T, D'Andrea wrote the script's reference to the Scarfo family, which RB & T advised against. But D'Andrea told RB & T that "the Simon campaign would assume all responsibility and indemnify RB & T."
Simon's recollection was that the script was written by D'Andrea and Frank Palmieri of RB & T. He denied any role in preparing it, and he claimed that he never heard it broadcast. However, he did admit that he approved it.
Plaintiff won the election handily. The final tally, according to testimony at trial, was 75,813 to 48,032. Despite having won, plaintiff claimed that he was harmed by the commercial because he had been told that his polling numbers had sustained a "substantial dip." He also said that 100 people had called him to express their outrage at the lies in the commercial. None of those people believed that the ad was true.

I
RB & T contends that the motion judge erred in failing to grant it summary judgment. It argues that: (1) plaintiff failed to establish that the offending statement was false; (2) plaintiff failed to show any injury to his reputation, and the motion judge wrongly relieved him of that burden by treating the statement as slander per se; and (3) even if plaintiff did establish a prima facie case of defamation, he did not raise a jury question as to defendants' fault under the "actual malice" standard.
In order to establish a prima facie case of defamation (whether denominated libel or slander), a plaintiff must show that defendant communicated to a third person a false statement about plaintiff that tended to harm plaintiff's reputation in the eyes of the community or to cause others to avoid plaintiff. Lynch v. New Jersey Educ. Ass'n, 161 N.J. 152, 164-65, 735 A.2d 1129 (1999); Feggans v. Billington, 291 N.J.Super. 382, 390-91, 677 A.2d 771 (App.Div.1996).
In deciding whether a statement is defamatory a court must examine three factors: content, verifiability, and context. Lynch, supra, 161 N.J. at 167, 735 A.2d 1129; Ward, supra, 136 N.J. at 529, 643 A.2d 972. First, a statement's content must be judged not by its literal meaning but by its objective meaning to a reasonable person of ordinary intelligence. Thus, mere insults and rhetorical hyperbole, while they may be offensive, are not defamatory. Lynch, supra, 161 N.J. at 167-68, 735 A.2d 1129.
Second, only verifiable statements can be defamatory. Since opinions and name-calling cannot be proved true or false, they are not actionable. Hence, recovery is limited to defamatory false averments of fact and the truth of the statement is a complete defense to a defamation action. Ibid.; Ward, supra, 136 N.J. at 530-31, 643 A.2d 972.
Third, a statement's meaning can be affected by its context. Lynch, supra, 161 N.J. at 168, 735 A.2d 1129. Thus, accusations during a heated political campaign are likely to carry less credibility for the average person than they would in a less emotional context. Ibid.
Another component of a statement's defamatory natureand thus an element of a prima facie caseis that plaintiff must have been harmed by the alleged defamation. Ward, supra, 136 N.J. at 539-42, 643 A.2d 972; Rocci v. Ecole Secondaire MacDonald-Cartier, 323 N.J.Super. 18, 23-24, 731 A.2d 1205 (App. Div.1999). Indeed, to survive a defendant's motion for summary judgment, a plaintiff must raise a sufficient question of fact as to actual injury to his or her reputation. Rocci, supra, 323 N.J.Super. at *1072 24-25, 731 A.2d 1205. For example, a plaintiff must adduce "concrete proof" that third parties lowered their estimation of the plaintiff and that he or she suffered emotional or pecuniary harm as a result. Sisler v. Gannett Co., Inc., 104 N.J. 256, 281, 516 A.2d 1083 (1986); Rocci, supra, 323 N.J.Super. at 23-24, 731 A.2d 1205.
It is not sufficient that the plaintiff's own feelings were hurt or that he or she suffered embarrassment. Ward, supra, 136 N.J. at 539, 643 A.2d 972; Rocci, supra, 323 N.J.Super. at 25, 731 A.2d 1205. Rather, the focus is on the effect of the alleged defamatory statement on third persons, that is, whether they viewed the plaintiff in a lesser light as a result of hearing or reading the offending statement. Arturi v. Tiebie, 73 N.J.Super. 217, 223, 179 A.2d 539 (App.Div.1962); Scelfo v. Rutgers Univ., 116 N.J.Super. 403, 411, 282 A.2d 445 (Law Div.1971). Thus, there can be no defamation if the recipients of the alleged defamatory statements did not believe them. Nanavati v. Burdette Tomlin Mem'l Hosp., 857 F.2d 96, 109 (3d Cir.1988), cert. denied, 489 U.S. 1078, 109 S.Ct. 1528, 103 L.Ed.2d 834 (1989).
The need to demonstrate damages is waived when the defamation is oral and can be categorized as slander per se. In such a case, damages are presumed. Ward, supra, 136 N.J. at 540, 643 A.2d 972. Four kinds of statements qualify as slander per se: accusing another (1) of having committed a criminal offense, (2) of having a loathsome disease, (3) of engaging in conduct or having a condition or trait incompatible with his or her business, or (4) of having engaged in serious sexual misconduct. Biondi, supra, 300 N.J.Super. at 154, 692 A.2d 103. In this case, the motion judge classified the statement as accusing plaintiff of having committed a criminal offense.
Once a plaintiff establishes that there was a defamatory statement, he or she then must prove an additional element of a prima facie case: that the defendant was at fault in publishing the defamation. Feggans, supra, 291 N.J.Super. at 391, 677 A.2d 771; Salek v. Passaic Collegiate Sch., 255 N.J.Super. 355, 361, 605 A.2d 276 (App.Div.1992). There are two fault standards. If the plaintiff is a private person, he or she need show only that the defendant was negligent. If, however, the plaintiff is a public figure, he or she need prove that the defendant was motivated by "actual malice"that the defendant either knew the statement was false or recklessly disregarded its falsity. Costello v. Ocean County Observer, 136 N.J. 594, 612, 643 A.2d 1012 (1994); Fortenbaugh v. New Jersey Press, Inc., 317 N.J.Super. 439, 455, 722 A.2d 568 (App. Div.1999). In this case it is undisputed that plaintiff was a public figure to whom the "actual malice" standard applied. The fault issue need not be reached if there was no defamation to begin with. Lynch, supra, 161 N.J. at 169, 735 A.2d 1129; Salek, supra, 255 N.J.Super. at 361, 605 A.2d 276. Thus, as noted in Salek: "The issue of fault in a defamation case arises only after a defamatory communication... has been established." 255 N.J.Super. at 361, 605 A.2d 276.

II
The motion judge first ruled that the statement in the radio commercial was capable of a defamatory meaning. Looking to its content, the judge noted that the statement "would be commonly understood as a specific act of illegal communication when done by a member of the State Police investigating the Scarfo Family and more generally as suggesting that plaintiff was `in the pocket' of the mob or was a mobster himself."
Moreover, the judge noted, the statement was verifiable, in that plaintiff "[e]ither... communicated with a member of the Scarfo Family or he didn't." Based on the record before him, the judge found that "plaintiff spoke only to Dennis Culnan, a Camden Courier reporter, a person who is not a member of the Scarfo family *1073 crime syndicate." Hence, the statement was "objectively false." The judge was "unimpressed" with defendants' urging that the statement should be deemed true because a leak to a newspaper reporter is equivalent to a leak to one who reads the newspaper, such as the Scarfo family. The judge reasoned that there was a "stark" difference in culpability between a State Police investigator giving information to a reporter, on the one hand, and giving information to the very target of the investigation, on the other.
The judge next considered the context "a knock-down, drag-out political campaign"but concluded that this statement went beyond mere name-calling and rhetorical hyperbole: it was a specific allegation of criminal wrongdoing.
Having found that the statement was defamatory as a matter of law, the motion judge addressed the extent to which plaintiff was bound to show that he was harmed by the defamation. He classified the statement as slander per se because it charged plaintiff with official misconduct, a crime under N.J.S.A. 2C:30-2 and "perhaps even a violation of certain federal [RICO] statutes...." Thus, plaintiff was not required to prove "special damages" (damages of a material or pecuniary nature), because damage to reputation is "presumed to flow" from slander per se. The judge acknowledged that the traditional distinction between libel and slander had virtually disappeared in New Jersey, but ruled that the slander per se rule of presumed damages was still viable.

III
RB & T disputes the motion judge's finding that the statement was false. During the summary judgment motions, RB & T and Simon argued that the statement did not say that plaintiff "directly" leaked the information or that the recipient of the leak was a "member" of the Scarfo organization. Arguing that nothing in the statement "ruled out indirect transmission of information through an intermediary," defendants reasoned that the statement should not be construed as accusing plaintiff of directly communicating with a member of the Scarfo group. On appeal, RB & T adds that, in the context of this "heated political campaign," the statement was nothing more than "rhetorical hyperbole." RB & T insists that the statement's departure from the "undisputed truth" was a semantic one only, and that there is no real difference between a direct leak to the Scarfo family and an indirect one via the newspaper.
In our view, the motion judge's resolution of this point was unassailable. There certainly is a significant difference between accusing a State Police officer of leaking information to the press and of leaking it to the Mafia target itself. The former, while unethical and violative of State Police rules, does not carry the extra sting of the latter, namely, that plaintiff committed the crime of official misconduct and "was `in the pocket' of the mob or was a mobster himself."
The judge correctly perceived that defendants' reading of the statement was not the one likely to be made by the average listener. The average listener would not focus on the statement's failure to include the adjective "directly" in front of "leaking," or on the absence of any reference to the recipient of the leak as being a "member" of the Scarfo family. Rather, the only reasonable and objective sense of the statement is that plaintiff's disclosure was to someone in the Scarfo family itself, not through the roundabout means of an interview with a newspaper reporter. We therefore conclude that the judge's characterization of the statement as being capable of defamatory meaning was correct.

IV
Having carried his burden of showing an objective defamatory meaning, the question is whether plaintiff must also show that his reputation was harmed. Resolution of that question requires us to *1074 examine the motion judge's holding that plaintiff was relieved of this burden because the statement accusing him of a crime was slander per se, and hence damage to his reputation was presumed.
The traditional distinction between slander and libel currently is undergoing a reexamination by New Jersey's courts. Its continued viability, at least in the context of radio commercials, is problematic, in light of recent pronouncements. Further, the subcategory of slander per se arguably has been all but abandoned.
The first harbinger of the erosion of socalled "presumed damages" in defamation actions was the Court's analysis in 1986 in Sisler, supra, 104 N.J. 256, 516 A.2d 1083. In that case the Court upheld a jury's award of $200,000 for damage to the plaintiff's reputation from libelous newspaper articles. The Court offered guidelines for assessing a plaintiff's burden of proving such general, as opposed to special (or pecuniary), damages:
Injury to reputation, even more so than personal injury or mental anguish, which are both amenable to expert testimony, defies exact measurement. The type of direct testimony lacking here has traditionally been hard to produce; in fact, it was this difficulty that engendered the "presumed damages" doctrine. However, the inherently amorphous quantification of libel damages potentially enables juries to vary damages awards in accordance with the popularity or unpopularity of the speaker or the view expressed. Accordingly, a plaintiff should offer some concrete proof that his reputation has been injured. One form of proof is that an existing relationship has been seriously disrupted, reflecting the idea that a reputation may be valued in terms of relations with others. Testimony of third parties as to a diminished reputation will also suffice to prove "actual injury." Awards based on a plaintiff's testimony alone or on "inferred" damages are unacceptable.
[Id. at 281, 516 A.2d 1083 (emphasis added) (citations omitted).]
Under that standard, the Court found that the plaintiff had presented sufficient evidence that one of his relationships had been "permanently impaired" by the articles. Ibid.
In 1994, the Court considered the tenability of presumed damages in the context of a slander case. Ward, supra, 136 N.J. at 539-41, 643 A.2d 972. The Court's main holding in Ward was that a neighbor's verbal insults and expressions of bigotry against the plaintiffs at a condominium-association meeting were not defamatory. Id. at 537-39, 643 A.2d 972. The Court added that, even if the bigoted statements had been defamatory, the plaintiffs failed to prove damages, which they were required to do because the slander did not qualify as slander per se. Id. at 539-42, 643 A.2d 972.
The Ward Court briefly reviewed recent commentary questioning the wisdom of maintaining the slander per se concept and recommending eliminating the per se categories in light of modern tort law's "focus on the injury not the wrong." Id. at 541, 643 A.2d 972. The Court termed slander per se "a relic from tort law's previous age." Ibid. The goal of defamation law should be to compensate persons for harm to their reputations; that goal is undercut by waiving the need for such proof of harm, as when the action falls within one of the slander per se categories. Ibid.
Nevertheless, the Court decided to "leave for another time whether [it] should eliminate slander per se," and declined to expand the four traditional slander per se categories to cover the bigoted statements in that case. Ibid. As the statements were ordinary slander, the plaintiffs were bound to, but did not, offer adequate proof of their reputational injury, id. at 541-42, 643 A.2d 972, such as "proof that an existing relationship has been seriously disrupted or testimony of third parties detailing a diminished reputation." Id. at 540, 643 A.2d 972.
*1075 The post-Ward status of slander per se was clarified in 1997 in Biondi, supra, 300 N.J.Super. at 152-57, 692 A.2d 103. In that case, the defendant rose at a public meeting of the New Jersey Board of Examiners of Master Plumbers and accused the plaintiff, chairman of the Board, of having "mob connections" and planning to "order a hit" on the defendant if he did not stop complaining. The trial court dismissed the plaintiff's slander action on summary judgment, reasoning that the comments did not accuse the plaintiff of a crime and thus were not slander per se, and the plaintiff had conceded that he could not prove any special damages. Id. at 152, 692 A.2d 103.
We affirmed, id. at 157, 692 A.2d 103, noting that the issue was not whether the comments were "defamatory per se" but whether they were "slander per se." Id. at 152, 692 A.2d 103. We explained the difference:
We note that confusion is sometimes caused by the fact that the term "per se" is used in connection with two quite distinct concepts in the law of defamation. The term "defamation per se" refers to a statement whose defamatory meaning is so clear on its face that the court is not required to submit the issue to the jury. Lawrence v. Bauer Publ'g & Printing, Ltd., supra, 89 N.J. [451] at 459, 446 A.2d 469 [1982]. On the other hand, "slander per se," the doctrine involved in this appeal, refers to four categories of slander which are considered so clearly damaging to reputation that a plaintiff may establish a cause of action without presenting any evidence of actual damage to reputation. Ward v. Zelikovsky, supra, 136 N.J. at 540, 643 A.2d 972; see generally, Rodney A. Smolla, Law of Defamation §§ 7.04, 7.06[2] (1986).
[Id. at 153 n. 2, 692 A.2d 103.]
Citing various treatises and law review articles, we observed that the slander per se doctrine had been "severely criticized" as allowing compensation when there is no harm. Id. at 154-55, 692 A.2d 103. Those critics recommend that "these archaic common law rules [presumed damages and special damages] should be replaced by a single uniform rule that a plaintiff must prove actual damage to reputation, either pecuniary or non-pecuniary, to establish any cause of action for defamation." Id. at 154, 692 A.2d 103. We concluded that until the Supreme Court formally abrogates slander per se (as some other states had), the "lower courts should invoke the slander per se doctrine only in cases where it clearly applies." Id. at 155-56, 692 A.2d 103. Thus we declined to expand the categories of slander per se to include the statements in that case, which did not specifically accuse the plaintiff of past criminal conduct. Id. at 156-57, 692 A.2d 103. See also Rocci, supra, 323 N.J.Super. at 24-25, 731 A.2d 1205 (holding that a defamation plaintiff, in both libel and slander cases, must always proffer proof of harm in fact).
From the foregoing cases we distill a shift in favor of the rule that a plaintiff in a libel or slander action must adduce concrete proof that he or she was harmed, either by way of pecuniary losses or injury to his reputation. See Ward, supra, 136 N.J. at 541-42, 643 A.2d 972; Sisler, supra, 104 N.J. at 281, 516 A.2d 1083; Biondi, supra, 300 N.J.Super. at 153, 692 A.2d 103; and Rocci, supra, 323 N.J.Super. at 24-25, 731 A.2d 1205. We are of the view that slander per se is on its last legs in New Jersey, and may no longer be a viable jurisprudential basis for awarding damages when there is no demonstrable harm. The Ward and Biondi decisions suggest that the time has come to adopt a uniform rule for both libel and slander actions: a plaintiff must prove actual reputational injury, either pecuniary or non-pecuniary.
Defamatory radio broadcasts "have been term[ed] sui generis, possessing characteristics of both libel and slander." Kelly v. Hoffman, 137 N.J.L. 695, 699, 61 A.2d 143 (E. & A.1948). They often involve the preparation of a written text which is delivered *1076 at the microphone. Ibid. Indeed, our court has treated a radio broadcast as libel without discussing the libel/slander distinction. See Wilson v. Grant, 297 N.J.Super. 128, 135-39, 687 A.2d 1009 (App.Div.1996), certif. denied, 149 N.J. 34, 692 A.2d 48, cert. denied, 522 U.S. 844, 118 S.Ct. 125, 139 L.Ed.2d 76 (1997).
The consensus elsewhere seems to be that radio and television broadcasts should be categorized as libel. Rodney A. Smolla, Law of Defamation § 104[4] (1986). That is the approach taken by the Restatement (Second) of Torts § 568A (1977): "Broadcasting of defamatory matter by means of radio or television is libel, whether or not it is read from a manuscript." The reason for the special treatment of such broadcasts is that they are heard by large numbers of people and hence can be just as damaging as written defamation. Id. at cmt. a. Some states have resolved the issue by statute. Id. at cmt. b. See generally Jeffrey F. Ghent, Annotation, Defamation by Radio or Television, 50 A.L.R.3d 1311 (1973).
The motion judge referred to the radio commercial as slander per se, a reference seized upon by RB & T as being contrary to the Restatement view. However, a reading of the judge's entire analysis suggests that it was not the label that was determinative, but rather the nature of the defamatory statement. In other words, the judge apparently reasoned that if the statement (of whatever kind) accused plaintiff of a crime, damages could be presumed and plaintiff relieved from his burden of proof.
The motion judge's packaging of defamations of whatever kind ignores the conceptual difference between "defamation per se" and "slander per se," as noted in Biondi, supra, 300 N.J.Super. at 153 n. 2, 692 A.2d 103. Moreover, in light of Ward, as interpreted in Biondi, we are not persuaded that our Supreme Court would accept the motion judge's presumption of damages in this case. The Court may well decide that this is the time and case to eliminate the slander per se categories. We leave that question for the Supreme Court to ponder. Suffice it to say that, since this was a radio broadcast as opposed to an in-person verbal exchange, it was more akin to a libel than to a slander. Hence there was no need to apply the slander per se exception to the general rule that a plaintiff must prove actual reputational injury. At the very least, the hybrid nature of the defamatory statement dictates against invoking the presumption of damages. As we cautioned in Biondi, supra, 300 N.J.Super. at 156, 692 A.2d 103, pending further clarification by our Supreme Court, slander per se should be used "only in cases where it clearly applies." Id. at 156, 692 A.2d 103. As radio broadcasts are not clearly slander (the consensus elsewhere is that they are libel), the slander per se analysis should not be applied here.
At the summary judgment stage, plaintiff produced no depositions or affidavits from third parties attesting to their lowered opinion of him as a result of the radio commercial. (At trial, plaintiff's counsel admitted that there were no such witnesses). Plaintiff stated in his deposition that none of the 100 people who had called him to express their outrage about the ad believed that its allegations were true. A statement cannot be defamatory if it was not believed by those to whom it was communicated. Nanavati, supra, 857 F.2d at 109.
Moreover, what evidential material that was presented, viewed in a light most favorable to plaintiff, was insufficient to permit a rational factfinder to find that plaintiff was damaged at all. Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540, 666 A.2d 146 (1995). He won the 1994 election by a landslide. The election results tend to discredit the only specific harm claimed by plaintiff, namely, that his pre-election polling numbers went down after the commercials aired. Absent any colorable claim of reputational injury, *1077 therefore, defendants should have been granted summary judgment.
Reversed and remanded for the entry of an order vacating the judgment in plaintiff's favor, and for the entry of a judgment of dismissal in defendant's favor.
NOTES
[1] William J. Simon settled with plaintiff while defendants' appeal was pending. Also named as defendants were Edmond Bonnette, Simon's campaign manager, Jerry Errigo, Simon's spokesperson, and Jane Fitzpatrick, Simon's campaign treasurer. The complaint against these defendants was dismissed at various stages of the proceedings. Thus, they do not participate in this appeal.