**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. <u>R.</u> 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0683-21

JACQUELINE MCDADE,

     Plaintiff-Respondent,

v.

P&P ASSOCIATES, INC.,
and STEVEN PAGLIONE,

     Defendants/Third-Party
     Plaintiffs-Appellants,

v.

MICHELLE O'NEILL,

     Third-Party Defendant-
     Respondent.

_____

Argued December 4, 2023 — Decided December 19, 2023

Before Judges Mawla and Chase.

On appeal from the Superior Court of New Jersey, Law
Division, Cape May County, Docket No. L-0437-18.

Louis Michael Barbone argued the cause for appellants (Jacobs & Barbone, PA, attorneys; Louis Michael Barbone, on the briefs).

Deborah Lynn Mains argued the cause for respondent Jacqueline McDade (Costello & Mains, LLC, attorneys; Drake P. Bearden, Jr., on the brief).

PER CURIAM

Defendants P&P Associates, Inc., and Steven Paglione appeal from a jury verdict in favor of plaintiff Jacqueline McDade finding defendants liable for defamation and awarding plaintiff $105,000 in unspecified damages and $500,000 in punitive damages. On appeal, defendants challenge the denial of their summary judgment motion to dismiss plaintiff's complaint pursuant to the entire controversy doctrine and the damages award. We affirm the summary judgment determination and vacate and remand the damages for retrial for the reasons expressed in this opinion.

Plaintiff is a licensed beautician who leased commercial space from P&P to operate her business, beginning in 2009. Two other businesses also occupied space at the premises. Paglione operated one of the businesses, and the third space was occupied by another tenant. Paglione is the sole owner of P&P.

The parties' dispute began when plaintiff complained about repairs that she needed defendants to make to her space. Paglione responded by verbally

abusing plaintiff and using vulgarities. In 2010, plaintiff had issues with the air conditioning and decided to withhold rent. P&P filed a landlord-tenant complaint for nonpayment and the parties ultimately settled the matter, with plaintiff agreeing to pay the rent, and P&P agreeing to install new air conditioning and heating units. However, plaintiff testified Paglione would not allow her to use the units for heat in the winter and would "shut off the breakers and tell [her] not to touch them because he didn't want them to get worn out." Plaintiff complained about other habitability issues, which were not resolved to her satisfaction.

In November 2017, plaintiff tried to turn on the heater in the hair salon and heard a "loud . . . crack . . . , pop noise." She got "nervous because [she] had been told multiple times that that heater was no good" so she immediately called the gas company. The gas company responded with firefighters and police officers. They evacuated plaintiff's salon and the third tenant's office and asked plaintiff if she had access to the space operated by Paglione. Plaintiff had a key and granted first responders access to Paglione's space. When the firefighters returned, they "told [plaintiff] that they had red-tagged the heater" and the "hot water heater because it was illegally installed."

A-0683-21

Plaintiff called Paglione, who was at the airport leaving for vacation, and said, "we have a problem with the heater" and Paglione responded, "What the f[***] did you do?" Paglione denied saying this but admitted he "might have dropped the F bomb . . . ." Plaintiff asserted Paglione hung up on her, but Paglione testified he told her to use the heat setting on the air conditioning units. Paglione's wife testified she heard Paglione's side of this conversation, and he did not "make any sexually harassing or derogatory comments . . . ."

The gas company informed code enforcement authorities that the alleyway behind defendant's building was blocked with debris and machinery, and the back door was not accessible. Brian Melchiorre, the local code enforcement officer, testified he visited the property and observed the debris. He sent a violation notice to P&P.

Plaintiff withheld the rent and retained Seth Fuscellaro, Esq. to help her get out of her lease. Fuscellaro had a telephone conversation with Paglione about plaintiff's intent to abate the rent due to the heating and other problems. Fuscellaro testified Paglione called plaintiff a "loser" and "trash," and "used the word f[***] numerous times . . . ." Paglione denied he said anything derogatory about plaintiff during his conversation with Fuscellaro. Paglione's daughter, who also served as his attorney, testified she was present when Fuscellaro called

4

Paglione and overheard Paglione "get upset" but did not hear him say anything derogatory about plaintiff. Paglione's wife testified she did not hear any "yelling or screaming" or anything derogatory about plaintiff during this phone call either.

Plaintiff's counsel sent Paglione's attorney a letter seeking termination of the lease based on plaintiff's various issues with the property. Following correspondence between the attorneys, a new heater was ultimately installed in early December 2017.

On December 6, 2017, P&P filed a landlord-tenant complaint against plaintiff for nonpayment of rent and utilities. The following day, Paglione called Melchiorre and said he would not comply with the notice of violation because the debris in the alley behind the building was "not the borough's business and the inspector [was] not permitted to be on his property." Melchiorre testified Paglione accused him of receiving oral sex from plaintiff in the alley. Paglione called Melchiorre a "loser" and that his wife and high-school-age daughters were "whore[s.]" Melchiorre was "shocked" at the language Paglione used.

Paglione testified he was "upset" during this phone call and "had words" with Melchiorre but denied saying "anything derogatory" about plaintiff. Paglione's wife's testimony corroborated his testimony.

 A-0683-21

On January 21, 2018, plaintiff and her employee, Michelle O'Neill, were in the hair salon. When plaintiff left, Paglione came in and said: "Michelle, we're good, right? We're not pieces of s[***] like that Jackie. We're good, we're good people. She is nothing but a n[*****]-loving, d[***]-sucking piece of s[***]. She f[*****] me, she f[*****] me good[,] and I'll get her." O'Neill asked Paglione to leave because he was "making [her] very uncomfortable and very nervous" and Paglione complied. Paglione denied making these statements to O'Neill.

Neither party appeared for the landlord-tenant proceeding on January 22, 2018. The court entered a default judgment of possession against plaintiff.

On January 25, 2018, Richard Murphy served a warrant of removal at the salon. Four of plaintiff's clients were present, as were Paglione and his wife. O'Neill was working that day and testified Paglione walked in and said, "Everybody get the f[***] out." O'Neill called plaintiff. Plaintiff testified she arrived at the salon to find Paglione and his wife "screaming [and] hollering, 'Everyone get the f[***] out of my building.'"

Murphy testified Paglione was only inside for "a minute or two, if that" and Murphy did not recall "him yelling or screaming or saying the F word . . . ."

A-0683-21

Paglione testified he and his wife were sitting in his car, and he "never talked" to plaintiff that day. His wife corroborated his testimony.

The parties ultimately agreed plaintiff would have a few days to vacate. Plaintiff moved her salon to a space she rented from Barbara Ann Flacco. Plaintiff spent a considerable sum in moving costs and renovations to Flacco's space to make it suitable for a hair salon.

Flacco testified she was a retired hairstylist who had known plaintiff since birth and had known Paglione for thirty years or longer. Paglione called Flacco in December or January because he heard plaintiff was going to rent from her. He said "all kind of crazy things" to Flacco and called plaintiff a "liar."

In February 2018, Paglione confronted Flacco outside of her property. Flacco testified Paglione was "livid" and "crazy" and called Flacco "a backstabbing SOB for renting to the N-lover[,]" referring to plaintiff. She said Paglione "use[d] the actual N word." Flacco told plaintiff and her husband what Paglione had said, and they were upset.

Paglione testified he called Flacco to ask whether plaintiff was "looking to move into [Flacco's] store[,]" which Flacco denied. He admitted going to Flacco's property but denied saying anything "rude or ignorant" to her.

7

Fuscellaro testified that, after plaintiff's eviction, he encountered Paglione in municipal court where Fuscellaro served as the public defender. When Paglione saw Fuscellaro, he became upset, approached Fuscellaro, and said "how can you represent that n[*****] lovin' piece of s[***,]" referring to plaintiff.

Fuscellaro also recalled an incident in July or August 2018, when he visited Paglione's pizzeria. Paglione and his other daughter told him to "get the f[***] out of here, you represent" plaintiff. They began to yell "choke and die" at him "as almost a chant."

Paglione denied making derogatory statements about plaintiff when he saw Fuscellaro in court. He testified when he saw Fuscellaro at his pizzeria, he told him, "you're not welcome here, and I'd appreciate if you don't come back." He admitted his daughter told Fuscellaro to "choke on it."

On February 26, 2018, P&P filed a Special Civil Part complaint against plaintiff for past due rent from November 2017 to January 2018, and "three years' worth of sewer bills." The complaint sought a judgment for $5,138.72. Plaintiff filed a handwritten answer stating: "We did not have heat for three months. All other repairs were ignored. Sewer [and] water were paid up to Dec[ember] 2017."

A-0683-21

On May 21, 2018, plaintiff retained a different attorney and filed a municipal criminal complaint, alleging Paglione harassed her and "stalked [her] in [the] parking lot as [she] would leave work." Plaintiff referred to Paglione's statements to Fuscellaro and O'Neill, his "harassing visits and phone calls to [Flacco]," and alleged Paglione entered her business when she was not present and, when asked to leave, stole a box of cookies. On June 4, 2018, a municipal complaint summons was issued, charging Paglione with bias intimidation, N.J.S.A. 2C:16-1(a); theft by deception, N.J.S.A. 2C:20-4; two counts of harassment, N.J.S.A. 2C:33-4(a) and (c); criminal mischief, N.J.S.A. 2C:17-3(a)(2); and theft of services, N.J.S.A. 2C:20-8.

The parties settled the Special Civil Part matter pursuant to a handwritten settlement agreement. Paglione's attorney testified she would not have recommended acceptance of this settlement if she had known plaintiff would later assert sexual harassment and defamation claims against Paglione.

On August 7, 2018, Paglione and plaintiff reached a consent agreement with respect to the municipal matter, which was dismissed without prejudice. Paglione agreed to: have no contact with plaintiff directly or via third parties; not make "any disparaging comments or remarks" about plaintiff, and not drive

past her hair salon or "park or stop his vehicle within 100 feet of [the hair salon,] unless he is required to stop at a traffic control device."

On October 16, 2018, plaintiff sued defendants in the Law Division. The complaint alleged they violated the New Jersey Law Against Discrimination (LAD), N.J.S.A. 10:5-1 to -50, and asserted the following LAD claims: sexual harassment in the course of a contractual relationship (count one); sexual harassment in a place of public accommodation (count two); discrimination in contract (count three); retaliation (count four); and retaliation "as to the individual defendant" Paglione (count five). Count six alleged defamation.

Defendants filed an answer and counterclaim, and a third-party complaint against O'Neill. The counterclaim alleged: malicious prosecution by filing a false criminal complaint against defendants (count one); and defamation (count two). Count one of the counterclaim was dismissed with prejudice by stipulation.

Defendants moved for summary judgment dismissal of the complaint. The trial judge granted partial summary judgment and dismissed counts two, four, and five. The remaining counts, along with defendant's counterclaim and third-party complaint, were tried before a jury over the course of four days. In addition to the testimony we have recounted, plaintiff testified Paglione's

10

offensive comments were borne of his animus toward her as a woman. He often referred to her as a "B-word" when he was angry. She believed his comments to others calling her an "N-lover" intended to reference her adult daughter who is a biracial child. In addition, she testified the comments Paglione made to her and others were embarrassing. She told the jury

> I should be at work today, I should have been at work yesterday, but instead I have to come and I have to deal with this and I've had to deal with this for three years, watching over my back every time I walk out the door. Wondering if something's going to happen to my business or how my reputation is being destroyed out there to anybody that wants to hear his story.

At the close of trial, the court granted plaintiff's motion for a directed verdict on defendants' counterclaim for defamation.

The jury returned a unanimous no cause verdict in favor of defendants on counts one and three. It returned a unanimous verdict in favor of plaintiff on count six. It returned a unanimous no cause verdict in favor of O'Neill on defendants' third-party complaint for defamation. The jury awarded plaintiff $105,000 in "damages . . . as a result of the defamation."

No additional testimony was taken in the punitive damages phase of the trial, and the parties stipulated to the valuation of defendants' income and assets. The jury awarded plaintiff $500,000 in punitive damages.

11 A-0683-21

Defendants moved for a judgment notwithstanding the verdict (JNOV) or a new trial, arguing the verdict and $105,000 damages award was against the weight of the evidence. Defendants also moved for a JNOV or a new trial on punitive damages. The trial judge denied the motions.

## I.

On appeal, defendants assert the trial judge erred by denying summary judgment pursuant to the entire controversy doctrine. They argue plaintiff's claims should have been brought during either the tenancy or Special Civil cases because they arose from the landlord-tenant relationship.

The entire controversy doctrine is "an equitable doctrine whose application is left to judicial discretion based on the factual circumstances of individual cases." Bank Leumi USA, v. Kloss, 243 N.J. 218, 227 (2020) (quoting Dimitrakopoulos v. Borrus, Goldin, Foley, Vignuolo, Hyman & Stahl, PC, 237 N.J. 91, 114 (2019)). Therefore, even though this issue was presented to the trial judge on summary judgment, we review it for an abuse of discretion, rather than de novo. Unkert by Unkert v. Gen. Motors Corp., 301 N.J. Super. 583, 595 (App. Div. 1997) (affirming denial of summary judgment under the entire controversy doctrine, finding no "abuse of the trial court's discretion in

not applying the doctrine"). See also Est. of Hanges v. Met. Prop. & Cas. Ins. Co., 202 N.J. 369, 384 (2010).[1]

The entire controversy doctrine is codified in Rule 4:30A. It "seeks to impel litigants to consolidate their claims arising from a 'single controversy' whenever possible." Dimitrakopoulos, 237 N.J. at 98 (quoting Thornton v. Potamkin Chevrolet, 94 N.J. 1, 5 (1983)). The doctrine "has three fundamental purposes: '(1) the need for complete and final disposition through the avoidance of piecemeal decisions; (2) fairness to parties to the action and those with a material interest in the action; and (3) efficiency and the avoidance of waste and the reduction of delay.'" Bank Leumi, 243 N.J. at 227 (quoting DiTrolio v. Antiles, 142 N.J. 253, 267 (1995)). Trial courts "should not preclude a claim under the entire controversy doctrine if such a remedy would be unfair in the totality of the circumstances and would not promote the doctrine's objectives . . . ." Id. at 227-28 (quoting Dimitrakopoulos, 237 N.J. at 119).

Application of the entire controversy doctrine "does not require commonality of legal issues. Rather, the determinative consideration is whether distinct claims are aspects of a single larger controversy because they arise from interrelated facts." DiTrolio, 142 N.J. at 271. However, the "forum of the earlier

_____

[1] Even if we were to exercise a de novo review, the result would be the same.

action must have afforded a fair and reasonable opportunity to litigate the claim in order for the doctrine to apply . . . ." Dimitrakopoulos, 237 N.J. at 115. "[T]he first forum must have been able to provide all parties with the same full and fair opportunity to litigate the issues and with the same remedial opportunities as the second forum." Id. at 117 (quoting Hernandez v. Region Nine Hous. Corp., 146 N.J. 645, 661 (1996)). "[T]he doctrine 'does not apply to unknown or unaccrued claims'" and fairness in its application "focuses on the litigation posture of the respective parties and whether all of their claims and defenses could be most soundly and appropriately litigated and disposed of in a single comprehensive adjudication." Wadeer v. N.J. Mfrs. Ins. Co., 220 N.J. 591, 606 (2015) (quoting DiTrolio, 142 N.J. at 274, 277).

Defendants assert that all of plaintiff's claims against them "sprung out of her [long-term] lease agreement" to operate her hair salon and, therefore, should be considered aspects of a single controversy arising from interrelated facts. We are unpersuaded.

Plaintiff's defamation claim was based solely on Paglione's statements about plaintiff to O'Neill, Melchiorre, Fuscellaro, and Flacco. The statements had nothing to do with the substance of the landlord-tenant dispute over habitability, or the Special Civil Part dispute over the rent and utilities. Not only

14

was Paglione not a party to the tenancy and Special Civil case, his defamatory statements targeted plaintiff's alleged personal, private, and sexual conduct, not her actions as a tenant.

We are unconvinced plaintiff had an opportunity to litigate her defamation claim in either prior action. She did not have a defamation claim when the tenancy action was happening because Paglione had not yet made his defamatory statements. Moreover, as the trial judge noted, "there is nothing . . . that shows [p]laintiff understood she would be giving up substantial tort claims by settling the rent dispute." The judge correctly found the tenancy action did not provide plaintiff "a full and fair opportunity to litigate" her claims.

The judge reached the same conclusions regarding the Special Civil Part matter. He noted the complaint was filed by P&P and would necessitate plaintiff joining Paglione and filing a counterclaim against P&P. He stated plaintiff was self-represented in the Special Civil Part action when she settled it. He concluded under these circumstances, "[i]t would be unjust to preclude her claims and penalize [p]laintiff for failing to understand that she must join parties and claims that were not connected with the dispute . . . ." The judge found the municipal criminal complaint did not bar plaintiff's complaint because it was

15

prosecuted by the State and "a criminal complaint does not preclude civil remedies."

The trial judge relied in part on Cafferata v. Peyser, 251 N.J. Super. 256 (App. Div. 1991).  There, the plaintiff—who had been a patient of the defendant and had been previously sued by the defendant in the Special Civil Part over unpaid medical bills, settling the Special Civil case for a nominal amount later— sued the defendant for malpractice.  Id. at 257-59.  On appeal, we reversed the trial court's grant of summary judgment to defendant under the entire controversy doctrine.  Id. at 259-60.  We noted nothing in the record showed that plaintiff knew he was giving up a substantial tort claim when he settled the Special Civil matter.  Id. at 261-62.  Even if the plaintiff had knowledge of his medical malpractice claims prior to the settlement of the collection action, it did not bar the malpractice claim because he did not have a "fair and reasonable opportunity to have fully litigated [the malpractice] claim in the original action." Id. at 261.  We noted the nominal amount in controversy in the Special Civil matter and the fact both parties were self-represented.  Ibid.

We concluded the entire controversy doctrine did not control because Special Civil cases are adjudicated in a forum "in which pro se litigants are able quickly, inexpensively, expeditiously, and with minimum resort to legal counsel

16

and judicial intervention, to resolve specifically stated and narrowly defined small claims" and not "intended to have preclusionary consequences beyond their own scope." Id. at 262-63. To apply the preclusive effect of the entire controversy doctrine would be unfair, "seriously undermine[]" the "legitimacy of small claims processing[,]" and "convert the entire controversy doctrine from an equitable device into a trap for the unsuspecting." Id. at 263.

Defendants are correct that the facts in Cafferata were slightly different. There, the plaintiff was self-represented in the Special Civil Part matter, id. at 261, whereas here, the judge mistakenly found plaintiff was self-represented. This distinction, however, is not dispositive. Here, like the problem we confronted in Cafferata, the landlord-tenant and Special Civil forums were inadequate to provide the proper processes to hear plaintiff's discrimination, defamation, and damages claims. Permitting these claims to proceed did not conflict with the entire controversy doctrine's precepts of promoting a complete and final disposition of disputes, fairness to the parties, and reducing delay. On the contrary, employing the doctrine would act as a sword, leaving substantial claims unresolved, depriving plaintiff of the right to have them adjudicated, and unnecessarily complicating the tenancy and Special Civil actions. There is no

17

assertion the jury trial in this case was inefficient. For these reasons, the trial judge correctly denied defendants summary judgment.

## II.

Defendants argue the trial judge incorrectly instructed the jury on compensatory and nominal damages. They assert there should have been no compensatory damages instruction because plaintiff did not adduce evidence she suffered any actual damages because of the defamation. Further, the instruction on nominal damages was contradictory and confusing. As a result of confusion in both the jury charge and the verdict sheet, it is unclear whether the jury intended the $105,000 award as compensatory or nominal damages.

Defendants did not object to the jury charge or the verdict sheet, but following the verdict moved for a JNOV or a new trial, which the trial court denied. On appeal, defendants confine their challenge on the damages issue to the trial court's denial of their post-trial motions.

During the charge conference, the trial judge stated he intended to use certain portions of Model Jury Charges (Civil), 8.46, "Defamation Damages (Private or Public)" (approved June 2014) (Model Charge). He would also instruct the jury using Sections A (Damages-General Instructions), C (Compensatory Damages-Emotional Suffering (In conjunction with actual

damages)), and D (Compensatory Damages (Nominal Damages for Slander Per Se or Libel)) of the Model Charge.  Both counsel signaled their acceptance of these proposed charges.  Plaintiff's counsel then remarked that regarding the defamation claim, the jury could award damages for plaintiff's emotional distress, or nominal damages.  The judge agreed.

The trial judge instructed the jury on defamation as follows:

> Our law holds that there are some categories of statements that are so injurious to a person that they incur damages by the mere saying of the statements.  These statements are called defamation per se.  A statement is considered per se defamatory if it asserts number one, a criminal offense; number two, a loathsome disease; number three, conduct, characteristics, or a condition that is incompatible with his or her business, trade, or office; or number four, serious sexual misconduct.

> In a claim for slander or defamation per se, a plaintiff does not need to prove damages, and a jury can presume damages.  <u>A person who is the victim of defamation per se is to be awarded by a jury a sum to compensate that victim.  This is referenced under the law as nominal damages.  The word "nominal" in this context is not intended to denote a small or modest sum, but the sum you the jury believe is appropriate to compensate the victim for the damages suffered.</u>

> I'm going to talk to you about damages under defamation.  For the injury to reputation caused by a defendant's alleged defamatory statement, the plaintiff seeks to recover compensatory damages.

19

Compensatory damages are sought by plaintiff for recovery of the money value of his or her losses.

I will first explain the law on compensatory damages. If a plaintiff has established the essential elements of his or her claim as explained in these instructions, he or she is entitled to compensatory damages for all the detrimental effects of a defamatory statement relating to the plaintiff's reputation, which were reasonably to be foreseen, and which are the direct and natural result of the defamatory statement. Damages awarded for such purposes are compensatory.

The foundation of an action for defamation is the injury to reputation. Hence, any award you choose to make as part of the compensation to plaintiff may only be to redress consequences which followed from injury to plaintiff's reputation. In connection with plaintiff's claimed emotional distress, I instruct you that the plaintiff or the third-party plaintiff may be compensated by you for such ill effects only if you find that he or she experienced them because of the actual damage done to his or her reputation.

If you find that his or her emotional suffering was caused only by his or her having read the [libel], or having heard the slander, having read or heard the defamation, and not by the publication's impact upon his or her reputation, you may not consider such suffering in arriving at the amount of damages you choose to award.

In the event you find the plaintiff is not entitled to actual damages, the plaintiff or the third-party plaintiff's claims [were] caused by defendant's wrongful act, then the plaintiff seeks recovery for nominal damages which the law presumes to follow naturally and necessarily from the defamation, and

A-0683-21

which are recoverable by plaintiff or the third-party plaintiff without proof of causation and without proof of actual injury.

. . . .

In fact, it has been said that damages which are presumed from the publication or statement or distribution of defamatory material, while not capable of being accurately measured, are in many ways more substantial and real than those which can be proved and measured accurately by the dollar standard.

For these reasons, you are permitted to award nominal damages to compensate a party, the plaintiff or the third-party plaintiff, for injury to reputation which you reasonably believe he or she sustained. <u>Nominal damages are a small amount of money damages that are not designed to compensate a plaintiff but are awarded for the infraction of a legal right where the extent of the loss is not shown</u> . . . .

[(emphasis added).]

As to the defamation claim, the verdict sheet asked the jury, "Has the plaintiff proven by a preponderance of the evidence that defendant . . . Paglione defamed her?" The jury unanimously answered "Yes." The next question was, "What amount of damages is plaintiff entitled to as a result of the defamation?" The jury unanimously responded "$105,000."

Defendant's post-judgment motions for JNOV or a new trial argued the verdict was against the weight of the evidence. The trial judge found the

21

evidence was "sufficient for a jury to conclude that [p]laintiff suffered reputational damages." He found defendant intentionally sought out and made his defamatory comments "to four different, unrelated people, all of whom lived or worked in" the same area. The judge concluded as follows:

> There was no purpose for making such comments other than to hurt [p]laintiff and her reputation in her community.
>
> It is also important to whom he made the comments: an employee, who might quit her job and leave [p]laintiff in a difficult position; the Code Enforcement Official who while performing his job must exercise substantial discretion, and who could exercise his discretion in a manner that substantially harms [p]laintiff; [p]laintiff's attorney, perhaps to get him to stop representing her; and her landlord, who could also make [p]laintiff's life difficult.
>
> A reasonable jury could conclude that the purpose and intent of the defamation was precisely to hurt [p]laintiff's reputation in her community, and potentially to hurt her relationship with people of influence in her life.

The judge found plaintiff "testified compellingly about the emotional distress she suffered knowing that [Paglione] was out there in the world making comments about her that would cause some to conclude that she was guilty of serious sexual misconduct."

Also, "[t]here was sufficient evidence for the jury to make a finding of defamation per se[,]" which would support an award of nominal damages. The judge acknowledged it was unclear whether the jury awarded plaintiff $105,000 in compensatory or nominal damages. However, this was irrelevant to whether the damages award should be sustained because "[t]he award of the damages was not the product of passion or emotion. The jury awarded $105,000 in compensatory or nominal damages . . . all within the instructions provided by the court." The judge concluded "the award of $105,000 was [not] so grossly excessive as to shock the conscience."

We review a trial court's denial of a motion for a JNOV or new trial applying the same standard as the trial court. Smith v. Millville Rescue Squad, 225 N.J. 373, 397 (2016). "The standard for granting a [JNOV] is essentially the same as that applicable to the grant of a new trial motion." Pressler & Verniero, Current N.J. Court Rules, cmt. 3 on R. 4:40-2 (2024). The court shall not grant a motion for a new trial unless, "having given due regard to the opportunity of the jury to pass on the credibility of the witnesses, it clearly and convincingly appears that there was a miscarriage of justice under the law." R. 4:49-1(a). A "'miscarriage of justice' can arise when there is a 'manifest lack of inherently credible evidence to support the finding,' when there has been an

'obvious overlooking or under-valuation of crucial evidence,' or when the case culminates in 'a clearly unjust result.'" Hayes v. Delamotte, 231 N.J. 373, 386 (2018) (quoting Risko v. Thompson Muller Auto. Grp., Inc., 206 N.J. 506, 521-22 (2011)).

"It is fundamental that '[a]ppropriate and proper charges to a jury are essential for a fair trial.'" Velazquez ex rel. Velazquez v. Portadin, 163 N.J. 677, 688 (2000) (alteration in original) (quoting State v. Green, 86 N.J. 281, 287 (1981)). Jury instructions "must outline the function of the jury, set forth the issues, correctly state the applicable law in understandable language, and plainly spell out how the jury should apply the legal principles to the facts as it may find them[.]" Wade v. Kessler Inst., 172 N.J. 327, 341 (2002) (alteration in original) (quoting Velazquez, 163 N.J. at 688).

"[I]n construing a jury charge, a court must examine the charge as a whole, rather than focus on individual errors in isolation." Carmona v. Resorts Int'l Hotel, Inc., 189 N.J. 354, 374 (2007) (citing Ryder v. Westinghouse Elec. Corp., 128 F.3d 128, 137 (3d Cir. 1997)). "[A]n appellate court will not disturb a jury's verdict based on a trial court's instructional error 'where the charge, considered as a whole, adequately conveys the law and is unlikely to confuse or mislead the jury, even though part of the charge, standing alone, might be incorrect.'" Wade,

A-0683-21

172 N.J. at 341 (quoting <u>Fischer v. Canario</u>, 143 N.J. 235, 254 (1996)). "Therefore, 'an appellate court must consider the language surrounding an alleged error in order to determine its true effect.'" <u>Smith v. Jersey Cent. Power & Light Co.</u>, 421 N.J. Super. 374, 394 (App. Div. 2011) (quoting <u>Viscik v. Fowler Equip. Co.</u>, 173 N.J. 1, 18 (2002)).

"Damages which may be recovered in an action for defamation are: (1) compensatory or actual, which may be either (a) general or (b) special; (2) punitive or exemplary; and (3) nominal." <u>W.J.A. v. D.A.</u>, 210 N.J. 229, 239 (2012) (quoting <u>Prosser and Keeton on Torts</u> § 116A at 842 (5th ed. 1984)). Actual damages are those "real losses flowing from the defamatory statement[,]" which are "'not limited to out-of-pocket loss,' but include[] 'impairment to reputation and standing in the community,' along with personal humiliation, mental anguish, and suffering to the extent that they flow from the reputational injury." <u>Ibid.</u> (quoting <u>Gertz v. Robert Welch, Inc.</u>, 418 U.S. 323, 350 (1974)). "Special" actual damages "compensate a plaintiff for specific economic or pecuniary loss." <u>Nuwave Inv. Corp. v. Hyman Beck & Co.</u>, 221 N.J. 495, 499 (2015). "General" actual damages "address harm that is not capable of precise monetary calculation." <u>Ibid.</u> "All compensatory damages, whether considered special or general, depend on showings of actual harm, demonstrated through

competent evidence, and may not include a damage award presumed by the jury." Ibid.

Nominal damages may be awarded in cases where damages are presumed, but the plaintiff "has not proved a compensable loss." W.J.A., 210 N.J. at 240, 249. Damages are presumed in instances of "slander per se"; that is, "when one accuses another:  '(1) of having committed a criminal offense, (2) of having a loathsome disease, (3) of engaging in conduct or having a condition or trait incompatible with his or her business, or (4) of having engaged in serious sexual misconduct.'"  Too Much Media, LLC v. Hale, 413 N.J. Super. 135, 166-67 (App. Div. 2010), aff'd as modified, 206 N.J. 209 (2011) (quoting McLaughlin v. Rosanio, Bailets, & Talamo, Inc., 331 N.J. Super. 303, 313-14 (App. Div. 2000)).  "Nominal damages are 'awarded for the infraction of a legal right, where the extent of the loss is not shown, or where the right is one not dependent upon loss or damage.'"  W.J.A., 210 N.J. at 240-41 (quoting Charles T. McCormick, Damages 85 (1935)).

An award of nominal damages is a "judicial declaration that the plaintiff's right has been violated[,]" id. at 241 (quoting McCormick, Damages 85), and "serves the purpose of vindicating the plaintiff's character by a verdict of a jury that establishes the falsity of the defamatory statement."  Id. at 241.  The

Punitive Damages Act (PDA), N.J.S.A. 2A:15-5.9 to -5.17, defines nominal damages as "damages that are not designed to compensate a plaintiff and are less than $500." N.J.S.A. 2A:15-5.10. "An award of nominal damages cannot support an award of punitive damages"; punitive damages are only available "if compensatory damages have been awarded in the first stage of the trial." N.J.S.A. 2A:15-5.13(c).

Pursuant to these principles, we are constrained to reverse the $105,000 award because the jury instruction on nominal damages was incorrect and confusing. As we recounted, the trial judge gave the jury two different and contradictory definitions of nominal damages. First, he told the jury "nominal" was "not intended to denote a small or modest sum, but the sum you the jury believe is appropriate to compensate the victim for the damages suffered." He then instructed them that "[n]ominal damages are a small amount of money damages that are not designed to compensate a plaintiff but are awarded for the infraction of a legal right where the extent of the loss is not shown."

The section of the judge's instruction advising the jury "nominal [is] not intended to denote a small or modest sum" was created by the judge. The latter part of the instruction advising "[n]ominal damages are a small amount of money

damages that are not designed to compensate a plaintiff" was drawn from Section D of the then-existing Model Charge.

Recently, our Supreme Court held Section D of the Model Charge was "contradictory" and "did not 'adequately convey[] the law'" because it stated both that the jury "could 'award nominal damages to compensate the plaintiff'" and that "[n]ominal damages . . . are not designed to compensate a plaintiff." Graphnet, Inc. v. Retarus, Inc., 250 N.J. 24, 42 (2022) (alterations in original) (quoting Fischer, 143 N.J. at 254). Graphnet involved a claim of trade defamation by a competitor, Retarus, who criticized Graphnet's performance in providing "cloud-based facsimile services" and "described the purported advantages of Retarus's services" in a brochure provided to potential customers. Id. at 30. "At trial, Graphnet introduced evidence that it had lost revenue from several clients after Retarus published the brochure, most notably J.P. Morgan Chase (JPMC)[,]" although JPMC personnel "stated that JPMC did not rely on the brochure in choosing Retarus as a new vendor." Id. at 31-32.

After being instructed in accordance with the Model Charge, the jury determined Graphnet had not proven any "actual damages that it suffered as a result of the statement made by Retarus" and awarded no compensatory damages. Id. at 34. The next question on the verdict sheet asked:

> In the event that you find that Graphnet is not entitled to actual damages, Graphnet may recover nominal damages without proof of causation and without proof of actual harm for the publication of the defamatory statement to a third party other than Graphnet. What is the amount of nominal damages Graphnet is entitled to compensate Graphnet for the injury to reputation which you reasonably believe is sustained?
>
> [Ibid.]

In response, the jury awarded Graphnet $800,000 in nominal damages. Ibid.

The trial court granted Retarus's motion for remittitur and reduced the award to $500 because it found the award was "grossly disproportionate to the purpose of nominal damages." Ibid. (quoting N.J.S.A. 2A:15-5.10). Although the Court reversed the grant of remittitur because Graphnet did not consent, it held the error in the jury charge required a remand for a new trial on the entire damages issue, compensatory and nominal. Id. at 41-42.

The Court found that, in accordance with the limit set in the PDA, "nominal damages, under New Jersey law, can best be defined as 'a token amount of not more than $500.'" Id. at 39. Thus, the Court required on remand that the jury be instructed on the $500 limit to nominal damages and referred the matter to the Committee on Model Civil Jury Charges for changes to the Model Charge. Id. at 43. The Committee thereafter amended the Model Charge incorporating the $500 limit on nominal damages. See Model Jury Charges

(Civil), 8.46, "Defamation Damages (Private or Public)" (approved June 2014; revised Nov. 2022).

The jury instruction here suffered from the same deficiency as the one in Graphnet.  The problematic nature of the instruction was further compounded by the contradictory definition of nominal damages, which advised this type of damages could be either small or large.  The judge's view the jury could award $105,000 in nominal damages, notwithstanding the $500 limit set forth in the PDA, was a mistaken application of law.

Moreover, the verdict sheet used here was problematic because, unlike the one in Graphnet, it did not contain separate interrogatories on compensatory and nominal damages.  See Sons of Thunder v. Borden, Inc., 148 N.J. 396, 418 (1997) (verdict sheet may be grounds for reversal if questions "were misleading, confusing, or ambiguous").  Therefore, we have no means of discerning whether the jury intended to award compensatory or nominal damages.

We reject defendants' claim it was reversible error for the trial judge to instruct the jury on compensatory damages at all because plaintiff produced no evidence of actual damages.  The trial judge found plaintiff produced sufficient evidence her emotional distress was a result of reputational injury to let the jury consider the question of compensatory damages.  He explained how there was

no purpose for Paglione's statements other than to damage her reputation in her community by damaging her relationship with her landlord, lawyer, employee, and code enforcement officials.

Actual damages for defamation may arise from "personal humiliation, mental anguish, and suffering" but only "to the extent that they flow from the reputational injury." W.J.A., 210 N.J. at 239 (quoting Gertz, 418 U.S. at 350). "Accordingly, a plaintiff should offer some concrete proof that his reputation has been injured." Sisler v. Gannett Co., 104 N.J. 256, 281 (1986). It is a "fatal deficiency" for a plaintiff seeking actual damages for defamation to provide evidence demonstrating only that "his sufferings were directly caused by defendants' remarks and not by their effect upon his reputation." Arturi v. Tiebie, 73 N.J. Super. 217, 223 (App. Div. 1962). Although "[t]estimony of third parties as to a diminished reputation will also suffice to prove 'actual injury[,]'" an "[a]ward[] based on a plaintiff's testimony alone or on 'inferred' damages [is] unacceptable." Sisler, 104 N.J. at 281.

Plaintiff presented evidence of her emotional distress in support of her damages claim resulting from Paglione's defamatory statements. However, none of the witnesses specifically testified plaintiff's reputation was in fact harmed because of Paglione's statements. Plaintiff testified she was harmed because,

for the past "three years" she had been "[w]ondering if something's going to happen to [her] business or how [her] reputation is being destroyed out there" but did not cite examples of actual reputational damage.

Our standard of review on a JNOV or new trial requires us to accord plaintiff "the benefit of all inferences which can reasonably and legitimately be deduced" from the testimony. Dolson v. Anastasia, 55 N.J. 2, 5 (1969). Reasonable minds can differ as to whether the testimony demonstrated plaintiff suffered a reputational injury. Sons of Thunder, 148 N.J. at 415. Under the circumstances of this case, it was not a miscarriage of justice to let the jury consider the compensatory damages issue.

However, because we are unable to discern whether the jury awarded compensatory or nominal damages, we vacate and remand the damages award for a new trial on damages. We further direct the court to fashion a verdict sheet that separately delineates the compensatory and nominal damages jury interrogatories.

### III.

Finally, we are in accord with defendants' argument the punitive damages award must be vacated because they are unavailable to a plaintiff who is awarded only nominal damages. Punitive damages may be awarded "if compensatory

32

damages have been awarded in the first stage of the trial." N.J.S.A. 2A:15-5.13(c). As we noted, we cannot discern whether the jury awarded plaintiff compensatory or nominal damages. For these reasons, the punitive damages award is vacated and shall abide the outcome of the retrial and whether plaintiff proves she is entitled to compensatory damages.

Affirmed in part and vacated and remanded in part. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0683-21